335 U.S. 377 (1948)
VERMILYA-BROWN CO., INC. ET AL.
v.
CONNELL ET AL.
No. 22.
Supreme Court of United States.
Argued October 15, 1948.
Decided December 6, 1948.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.
*378 Charles Fahy argued the cause for petitioners. With him on the brief were Joseph Markle, Franklin Nevius, J. Randall Creel and Philip Levy.
Sol L. Firstenberg argued the cause for respondents. With him on the brief was Jacob Bromberg.
Solicitor General Perlman, Assistant Attorney General Morison, Robert L. Stern, Paul A. Sweeney and Melvin Richter filed a brief for the United States, as amicus curiae, urging reversal.
MR. JUSTICE REED delivered the opinion of the Court.
This case brings before us for review the applicability of the Fair Labor Standards Act of 1938, 52 Stat. 1060, to employees allegedly engaged in commerce or the production of goods for commerce on a leasehold of the United States, located on the Crown Colony of Bermuda.
The leasehold, a military base, was obtained by the United States through a lease executed by the British Government. This lease was the result of negotiations adequately summarized for consideration by the letters of the Marquess of Lothian, the British Ambassador to the United States, of date September 2, 1940; the reply *379 of Mr. Cordell Hull, then our Secretary of State, of the same date; and the Agreement of March 27, 1941, between the two nations to further effectuate the declarations of the Ambassador in his letter.[1]
The Fair Labor Standards Act covers commerce "among the several States or from any State to any place outside thereof." State means "any State of the United States or the District of Columbia or any Territory or possession of the United States." § 3 (b) and (c) of the Act.
Certain employees of contractors who had contracts for work for the United States on the Bermuda base brought this suit under § 16 (b) of the Act for recovery of unpaid overtime compensation and damages, claimed to be due them for the employer's violation of § 7, requiring overtime compensation. We do not enter into any consideration of the employees' right to recover if the Fair Labor Standards Act is applicable to employment on the Bermuda base, for the complaint was dismissed on defendant's motion for summary judgment on the ground that the applicability depended upon the "sovereign jurisdiction of the United States," that the executive and legislative branches of the Government had indicated that such leased areas were not under our sovereign jurisdiction and that this was a political question outside of judicial power. Connell v. Vermilya-Brown Co., 73 F. Supp. 860. The United States Court of Appeals for the Second Circuit, holding that the Act applied to the Bermuda base, reversed this judgment and remanded the case to the District Court for further proceedings on the merits. 164 F.2d 924. Our affirmance of this judgment approves that disposition of the appeal.
*380 On account of the obvious importance of the case from the standpoint of administration, in view of the number of leased areas occupied by the United States, we granted certiorari. 333 U.S. 859.
(1) We shall consider first our power to explore the problem as to whether the Fair Labor Standards Act covers this leased area. Or, to phrase it differently, is this a political question beyond the competence of courts to decide? Cf. Coleman v. Miller, 307 U.S. 433, 450; Colegrove v. Green, 328 U.S. 549, 552. There is nothing that indicates to us that this Court should refuse to decide a controversy between litigants because the geographical coverage of this statute is involved. Recognizing that the determination of sovereignty over an area is for the legislative and executive departments, Jones v. United States, 137 U.S. 202, does not debar courts from examining the status resulting from prior action. De Lima v. Bidwell, 182 U.S. 1; Hooven & Allison Co. v. Evatt, 324 U.S. 652. We have no occasion for this opinion to differ from the view as to sovereignty expressed "for the Secretary of State" by The Legal Adviser of the Department in his letter of January 30, 1948, to the Attorney General in relation to further legal steps in the present controversy after the judgment of the Court of Appeals. It was there stated:
"The arrangements under which the leased bases were acquired from Great Britain did not and were not intended to transfer sovereignty over the leased areas from Great Britain to the United States."
Nothing in this opinion is intended to intimate that we have any different view from that expressed for the Secretary of State. In the light of the statement of the Department of State, we predicate our views on the issue presented upon the postulate that the leased area is under the sovereignty of Great Britain and that it is not territory *381 of the United States in a political sense, that is, a part of its national domain.
(2) We have no doubt that Congress has power, in certain situations, to regulate the actions of our citizens outside the territorial jurisdiction of the United States whether or not the act punished occurred within the territory of a foreign nation. This was established as to crimes directly affecting the Government in United States v. Bowman, 260 U.S. 94. This Court there pointed out, p. 102, that clearly such legislation concerning our citizens could not offend the dignity or right of sovereignty of another nation. See Blackmer v. United States, 284 U.S. 421, 437; Skiriotes v. Florida, 313 U.S. 69, 73, 78. A fortiori civil controls may apply, we think, to liabilities created by statutory regulation of labor contracts, even if aliens may be involved, where the incidents regulated occur on areas under the control, though not within the territorial jurisdiction or sovereignty, of the nation enacting the legislation.[2] This is implicitly conceded by all parties. This power is placed specifically in Congress by virtue of the authorization for "needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Constitution, Art. IV, § 3, cl. 2.[3] It does not depend upon sovereignty in the political or any sense over the territory. So the Administrator of the Wage-Hour Division has issued a statement of general policy or interpretation that directs all officers and agencies of his division to apply this Act to the Canal Zone, admittedly territory over which we do not have sovereignty. 29 C.F.R., 1947 Supp., pp. 4392-93.
*382 (3) In this view of the relationship of our government to a leased area, the terms of this particular lease become important. Reference, note 1, supra, has been made to the United States Statutes where the title documents are readily available. It is unnecessary to print them here in full. In the margin are extracts that indicate their meaning as to the control intended to be granted.[4] Under *383 this agreement we have no doubt that the United States is authorized by the lessor to provide for maximum hours and minimum wages for employers and employees within the area, and the question of whether the Fair Labor Standards Act applies is one of statutory construction, not legislative power.
(4) At the time of the enactment of the Act, June 25, 1938, the United States had no leased base in Bermuda. This country did have a lease from the Republic of Cuba of an area at Guantanamo Bay for a coaling or naval station "for the time required for the purposes of coaling and naval stations." The United States was granted by the Cuban lease substantially the same rights as it has in the Bermuda lease.[5] The time limits of the grant were redefined on June 9, 1934, as extending until agreement for abrogation or unilateral abandonment by *384 the United States. A similar arrangement existed in regard to the Panama Canal Zone.[6] Further, in the Philippine Independence Acts of January 17, 1933, and March 24, 1934, provisions existed looking toward the retention of military and other bases in the Philippine Islands. 47 Stat. 761, §§ 5 and 10; 48 Stat. 456, §§ 5 and 10.[7] A Convention between the governments of Nicaragua and the United States of America, proclaimed June 24, 1916, 39 Stat. 1661, gave the United States for 99 years "sovereign authority" over certain islands in the *385 Caribbean Sea.[8] None of these international arrangements were discussed in reports or the debates concerning the scope of the Fair Labor Standards Act. After the passage of the Fair Labor Standards Act and during World War II, a number of bases for military operations were leased by the United States not only on territory of the British Commonwealth of Nations but on that of other sovereignties also. The provisions of these leases paralleled in many respects the Bermuda lease.[9]
Neither this lack of specific reference in the legislative history to leased areas, however, nor the fact that the particular Bermuda base was acquired after the passage of the Act seems to us decisive of its coverage. "The reach of the act is not sustained or opposed by the fact that it is sought to bring new situations under its terms."[10] The Sherman Act of 1890, a date when we had no insular possessions, was held by its use of the word "Territory" in its § 3 to be applicable in Puerto Rico, a dependency acquired by the Treaty of Paris in 1898.[11] The answer as to the scope of the Wage-Hour Act lies in the purpose of Congress in defining its reach.
*386 (5) The point of statutory construction for our determination is as to whether the word "possession," used by Congress to bound the geographical coverage of the Fair Labor Standards Act, fixes the limits of the Act's scope so as to include the Bermuda base. The word "possession" is not a word of art, descriptive of a recognized geographical or governmental entity. What was said of "territories" in the Shell Co. case, 302 U.S. 253, at 258, is applicable:
"Words generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed."
The word "possession" has been employed in a number of statutes both before and since the Fair Labor Standards Act to describe the areas to which various congressional statutes apply.[12] We do not find that these examples sufficiently outline the meaning of the word to furnish *387 a definition that would include or exclude this base. while the general purpose of the Congress in the enactment of the Fair Labor Standards Act is clear,[13] no *388 such definite indication of the purpose to include or exclude leased areas, such as the Bermuda base, in the word "possession" appears. We cannot even say, "We see what you are driving at, but you have not said it, and therefore we shall go on as before."[14] Under such circumstances, our duty as a Court is to construe the word "possession" as our judgment instructs us the lawmakers, within constitutional limits, would have done had they acted at the time of the legislation with the present situations in mind.
The word "possession" in the Act includes far-off islands whose economy differs markedly from our own. Thus the employees of Puerto Rico, Guam, the guano islands, Samoa and the Virgin Islands have the protection of the Act. See 29 C.F.R. 1947 Supp., 4393. Since drastic change in local economy was not a deterrent in these instances, there is no reason for saying that the wage-hour provisions of the Act were not intended to bring these minimum changes into the labor market of the bases.[15] Since its passage of the Act, Congress has extended the coverage of the Longshoremen's and Harbor Workers' Compensation Act to the bases acquired since January 1, *389 1940, and to Guantanamo Bay.[16] When one reads the comprehensive definition of the reach of the Fair Labor Standards Act, it is difficult to formulate a boundary to its coverage short of areas over which the power of Congress extends, by our sovereignty or by voluntary grant of the authority by the sovereign lessor to legislate upon maximum hours and minimum wages. Under the terms of the lease, we feel sure that the House of Assembly of Bermuda would not also undertake legislation similar to our Fair Labor Standards Act to control labor relations on the base. Since citizens of this country would be numerous among employees on the bases, the natural legislative impulse would be to give these employees the same protection that was given those similarly employed on the islands of the Pacific.
Under subdivisions 2 and 3, supra, we have pointed out that the power rests in Congress under our Constitution and the provisions of the lease to regulate labor relations on the base. We have also pointed out that it is a matter *390 of statutory interpretation as to whether or not statutes are effective beyond the limits of national sovereignty. It depends upon the purpose of the statute. Where as here the purpose is to regulate labor relations in an area vital to our national life, it seems reasonable to interpret its provisions to have force where the nation has sole power, rather than to limit the coverage to sovereignty. Such an interpretation is consonant with the Administrator's inclusion of the Panama Canal Zone within the meaning of "possession."
We think these facts indicate an intention on the part of Congress in its use of the word "possession" to have the Act apply to employer-employee relationships on foreign territory under lease for bases. Such a construction seems to us to carry out the remedial enactment in accord with the purpose of Congress.
Affirmed.
MR. JUSTICE JACKSON, dissenting.
The serious question in this case is not as to the meaning of the Fair Labor Standards Act. It means just what it says when it provides that it shall apply in any Territory or possession of the United States and I would apply it to every foot of soil that, up to the time of this decision, has been regarded as our possession.
The real issue here, and it is a novel one, is whether this Court will construe the lease under which the United States occupies a military base in Bermuda as adding it to our possessions. The labor for which overtime under the Act is sought was performed for a government contractor on this military base. The base did not exist when the Act was passed and it does not either expressly or impliedly purport to cover work in that area, unless the word "possession" shall be construed to include the leased lands. Whether it is appropriate or permissible to hold *391 as matter of law that our tenure there constitutes the leasehold area a possession obviously turns on a reading of the lease from Great Britain.
The Court of Appeals read the lease to give "sweeping powers" to the United States and declared that "the areas are subject to fully as complete control by the United States as obtains in other areas long known as `possessions' of the United States." It names as comparable possessions Alaska, Hawaii, Puerto Rico, Guam, Samoan Islands, Virgin Islands and the Canal Zone. This Court seems to approve that premise because it affirms, citing some if not all of the same examples; but it also says, ". . . it is difficult to formulate a boundary to its [the Act's] coverage short of areas over which the power of Congress extends, . . . to legislate upon maximum hours and minimum wages."[1]
Thus application of the Act to the leased area is put on two grounds: first, that the area is a possession of the United States; and second, since the Act applies to those "engaged in commerce or in the production of goods for commerce,"[2] it operates wherever Congress has power to act with respect to commerce. Presumably the Court will not shrink from applying the converse of the latter proposition; that the Act does not apply where this country or its nationals are not engaged in commerce.
*392 Bermuda and like bases are not, in my opinion, our possessions on a juridical and geopolitical footing with the possessions enumerated. I also believe that there is not and under the lease there can not be in the leased area any "commerce" subject to the Act.
To consider the bases as possessions in that sense is incompatible with the spirit of the negotiations and with the letter of the lease by which the bases were acquired. It enlarges the responsibilities which the United States was willing to accept and the privileges which Great Britain was willing to concede. This will appear from the history of the transaction whose meaning we interpret.
When organized resistance in the Low Countries and in France went down and the German Wehrmacht stood poised on Europe's Atlantic seaboard, it was suspected, as it since has been proved, that the design for conquest embraced seizure of Atlantic islands as a pathway for future operations against the United States.[3] Disasters on land and sea had brought threat of invasion of the British Isles nearer to reality than at any time since the Spanish *393 Armada. Consequently, Great Britain could divert no forces to the defense of her island possessions in our hemisphere, which after all were strategic spots to assail our commerce and stepping stones to our gateways.[4] Great Britain, however, desperately in need of destroyers to defend her shores, intimated a readiness to put the United States in a position to defend these islands and the Americas as a quid pro quo for overaged American destroyers.[5]
Among those who saw in the development of air warfare a necessity for moving our air defense outposts seaward from the cities which dot our own shores, an influential and respected group favored asking England to cede her island possessions in this hemisphere to us as an outright transfer of sovereignty. If this cession had been asked and granted, the Court would now rightly hold the bases to be our "possessions." But it was President Roosevelt himself who determined for this country that it was the part of wisdom neither to seek nor to accept sovereignty or supreme authority over any part of these islands. He decided that it was in our self-interest to limit the responsibilities of the United States strictly to establishment, maintenance and operation of military, naval and air installations. His reasons have been partially disclosed[6] and one of them, apparent to anyone *394 even casually travelled in those islands, was the great disparity of social, economic and labor conditinns between the islands and our Continent. Also he knew full well the different customs and institutions prevailing there, particularly the relations between the white, colored and native races, and the difficulty of assimilating them into the American pattern  a prospect that would arouse emotional tensions in this country as well as in the Islands and which indeed caused some anxiety even in Westminster.[7] Thus it was settled American policy, grounded, as I think, on the highest wisdom, that, whatever technical form the transaction should take, we should acquire no such responsibilities as would require us to import to those islands our laws, institutions and social conditions beyond the necessities of controlling a military base and its garrison, dependents and incidental personnel.
Knowledge of that policy and purpose gives a measure of the novel and dubious grounds for the Court's present determination to put these bases upon the legislative and juridical footing of "Territories and possessions." It is a first step in the direction of the very imprudence that was sought to be avoided by the limited tenure devised for the bases.
But if American interests neither require nor admit of the assumption that the bases have become our possessions, the bounds of the grant as understood and expressed by Great Britain deny it with even more compelling force. The confined character of the granted privileges *395 and their incompatibility with either sovereignty or proprietorship on our part appear from the letter of the Marquess of Lothian to Secretary Hull of September 2, 1940, which committed the United Kingdom to grant to the United States "the lease for immediate establishment and use of Naval and Air bases and facilities for entrance thereto and the operation and protection thereof," on the Great Bay of Bermuda.[8] All of the specific provisions of the formal lease were subsidiary to and within this general measure of the rights yielded. It comprehended all that it was intended to bestow and all that we intended to take. Its dimensions were well defined by Mr. Stimson as "the right to fortify and defend."[9]
Details of the formal lease do but emphasize the common purpose of Great Britain to so confine the concession and that of President Roosevelt to so circumscribe our responsibilities. The leasehold right of the United States, in war time or emergency, to conduct military operations on land, water or in the air, which was the heart of the matter for us, is without bounds or restrictions except for a pledge of good neighborliness and friendly cooperation in their exercise.
The leasehold terms, however, are well chosen, carefully to deny every commercial and political right to the United States except as they are incidental and appurtenant to this primary military usufruct. American nationals cannot go there for any purpose other than governmental except in conformity to Bermudian laws. Its immigration laws are relaxed only to admit "any member of the United States Forces posted to a Leased Area" and "any person (not being a national of a Power at war *396 with His Majesty the King) employed by, or under a contract with, the Government of the United States in connection with the construction, maintenance, operation or defence of the Bases." Even so, the lessee must submit to measures to identify such persons and to establish their status. In what formerly recognized possession of the United States mentioned by the Court is American citizens' privilege of ingress and egress, of transit and of residence, so limited?
Private trade and commerce by our citizens likewise are wholly in control of the Colony and are no more dependent upon our laws than in any other part of the United Kingdom or any foreign country. Bermudian customs duties are waived only on material for construction and maintenance of our bases, for consumption by our garrisons and supporting personnel, and on their household goods; and we undertake to prevent abuse of this customs privilege and to prevent resale of such imports. This is not greater than the immunity allowed by every foreign country to our diplomatic corps and staffs, and the power reserved by Britain over imports and customs is wholly inconsistent with the concept that these are our possessions.
The lease also expressly and unconditionally provides that no business can be established in the leased arda and that no person shall habitually render any professional services except for the Government and its personnel. No wireless or submarine cable may be operated except for military purposes. Are such stifling restraints by another state consistent with the idea of our possession?
Payment of local income and property taxes are only waived as against those in the area when they are members of our armed forces, employees engaged in our works or contractors with our Government. In short, no actual possession of the United States used by the Court as a standard of reference is so insulated from the United *397 States in fiscal, social, economic, commercial and political affairs. In none is the commerce power of Congress so stripped of subject matter for regulation or our permissible range of activity so circumscribed.
Possessions such as Puerto Rico, Guam, the guano islands, Samoa and the Virgin Islands, which the Court mentions as standards for the treatment of Bermuda, are, in vital respects, as different from it as night from day. Not one of them is subject to even a frivolous claim adverse to our complete ownership. They belong to us or they belong to no one. They are ceded territory over which United States sovereignty is as complete and as unquestioned as over the District of Columbia and they are subject to no dual control or divided allegiance. They are incorporated into our economy, freely trading in our markets, and "protected" by our tariff walls. They are integrated with our social and, in some degree at least, with our political life as well; some of them being authorized to send delegates to our Congress.
On the other hand, however, Bermuda never has ceased in its entirety to be a Crown Colony of Great Britain. Social, industrial and labor conditions prevailing at the Island bases are such that both nations made every effort to insulate them from the damaging effects of our limited occupation for military purposes. It seems to me unsound policy as well as capricious statutory interpretation for the Court blindly to mingle them by imposing statutory policies that were not shaped with their existence or peculiarities in mind. It may be that, in some matters, the same policies suited to our legitimate possessions will also be considered adaptable to the bases. But it is not necessarily or presumptively so, and where the bases are to be brought into our scheme of things, it should be deliberately and consciously done by the Congress, in particular matters and with particular *398 regard to local conditions,[10] and perhaps after consultation with the United Kingdom or Colonial authorities. We should not by the process of judicial interpretation impose upon the bases not only the policies of the Act before us but those of many Acts not involved here and as to which we are even less informed.[11]
*399 Neither should we embark upon a course of making the same naked words mean one thing in one Act and something else in another. It cannot be pretended that such an interpretation as the Court announces is in response to any demonstrable intention of Congress on the *400 subject, for when this Act was passed the Bermuda base was not in being nor was it within the contemplation of even the more foresighted.
It should be enough to dispose of this matter to point out that the United States has no supreme authority or sovereign function in Bermuda, where every commercial *401 activity is subject to control by another sovereign which is our political superior in the island. We have no commercial rights in Bermuda in the sense of private enterprise such as Congress by this Act sought to regulate. The United States cannot in good faith conduct or permit its nationals to engage in industry, manufacture or trade there. It cannot authorize them to conduct commerce there or to produce goods for commerce, which are the conditions which this Act itself makes necessary to bring the Labor Standards Act into play. To do so would be a flagrant breach of good faith with the United Kingdom and an overreaching of the people of Bermuda. Small wonder that the Department of State feels constrained to inform us that it "regards as unfortunate" the conclusion of the court below, which is now affirmed, and adds a warning that any holding that the bases are "possessions" of the United States in a political sense "would not in the Department's view be calculated to improve our relations with that Government."[12]
*402 The Canal Zone has been cited as a possession with which Bermuda is comparable. But the Isthmian Canal Convention of 1903, which ceded the Canal Zone to the United States, provides in Art. III that the United States is to have "all the rights, power and authority within the zone . . . which the United States would possess and exercise if it were the sovereign . . . to the entire exclusion of the exercise by the Republic of Panama of any such sovereign rights, power or authority."[13] Our State Department has firmly maintained that this treaty confers upon the United States complete power of commerce.[14] To such an extent, indeed, are we sovereign in the Canal Zone that Panama has been granted special commercial rights only by express and formal concession,[15] and this Court has reviewed the history of the acquisition and concluded that the title of the United States is complete and perfect. Wilson v. Shaw, 204 U.S. 24, at 32, 33.
*403 But the Panama Canal history may well be explanatory of a paragraph of the Bermudian lease from Great Britain, upon which the court below and respondent heavily rely and which this Court cites as one of the significant provisions. This clause provides that the "Leased Area is not a part of the territory of the United States for the purpose of coastwise shipping laws so as to exclude British vessels from trade between the United States and the Leased Areas." From this provision it is sought to draw the conclusion that for all other purposes the area is part of the territory of the United States. The remaining provisions of the identical paragraph are sufficient to negative any idea that the territory becomes a United States possession.[16] But coastwise shipping privileges had been the subject of friction between the United States and Great Britain over the Panama Canal and the plain purport of the article is to say that we do not want to repeat that experience. The Panama Canal Act of 1912, 37 Stat. 560, 562, exempted American coastwise shipping from tolls, which the British Government represented to be a violation of the Hay-Pauncefote Treaty of 1901 and which it considered a corollary of the Clayton-Bulwer Treaty of 1850. President Wilson recommended that Congress repeal the exemption favoring American coastwise shipping as against British shipping[17] and the action *404 was taken only after a bitter and extensive debate.[18] I think that the clause, instead of being read to create a possession of the leased bases would, in the light of our tendency to favor our shipping, be more accurately read *405 to say "even for the purposes of coastwise shipping, the leased area shall not be considered a possession."
Guantanamo Naval Base, also referred to, is a leased base in Cuba upon which we have agreed that "no person, partnership, or corporation shall be permitted to establish or maintain a commercial, industrial or other enterprise." But Guantanamo has been ruled by the Attorney General not to be a possession;[19] it has not been listed by the State Department as among our "non-self-governing territories,"[20] and the Administrator of the very Act before us has not listed it among our possessions.[21] Its treatment confirms our view that neither is Bermuda a possession.
Among responsible agencies of the United States, this Court alone insists that the Bermuda bases are possessions. The Department of Justice files a brief urging the Court against this position; the Department of State warns of its dangers and harmful effects upon our foreign relations; the Wage and Hour Administrator ruled administratively against coverage in Bermuda.[22] Congress *406 has shown that it has not regarded the leased areas as "possessions."[23]
Heretofore it has been thought that the Court should follow rather than overrule the Executive department in matters of this kind.[24]
*407 What I have said does not reflect the slightest doubt about the power of Congress to make government contractors, doing work in Bermuda or anywhere else in the world, whether in our own or in foreign possessions, pay time-and-a-half for overtime or to enforce almost any *408 labor policy upon them.[25] The power of Congress, by appropriate legislation, to govern such a relationship is not impaired if we hold that the place where the contract is performed is not our "possession." The holding that it is a possession is not essential to enable Congress to act but serves only the purpose of expanding the coverage of this Act to the bases without specific action by Congress. We need not resort to such an unwarranted and disturbing interpretation of our relations with Bermuda and the United Kingdom in order to preserve the full power of Congress to extend all proper protection to the wages and hours of all personnel at the base, because they are and can be there only by virtue of government assignment or government contracts.
In summary: Congress made the Act applicable in our "possessions." There is no indication or reason to believe that, had Congress considered the matter, it would have regarded our tenure in the Bermuda base as creating a "possession," or would have applied an Act regulating private employment to an area where no such private enterprise could exist. There is no indication of a purpose to apply the Act to an exclusively military operation? indeed the Act indicates the contrary by exempting government employees from its operation.[26]
It would not concern the United Kingdom, or the Colony of Bermuda, if the United States should require its contractors to pay overtime, upon any assumptions which do not imply a possession adverse to theirs. But I do think it will cause understandable anxiety if this Court does it by holding, as matter of law, that the leased areas are possessions of the United States, like those we *409 govern to the exclusion of all others. Such a decision by this Court initiates a philosophy of annexation and establishes a psychological accretion to our possessions at the expense of our lessors, not unlikely to be received in more critical quarters abroad as confirmation of the suspicion that commitments made by our Executive are lightly repudiated by another branch of our Government. It should be the scrupulous concern of every branch of our Government not to overreach any commitment or limitation to which any branch has agreed.[27]
I would reverse the judgment below and direct dismissal of the complaint.[28]
I am authorized to state that THE CHIEF JUSTICE, MR. JUSTICE FRANKFURTER and MR. JUSTICE BURTON join in this opinion.
NOTES
[1] 55 Stat. 1560, 1572, 1576, 1590.

Those documents are published in Department of State publication No. 1726, Executive Agreement Series 235.
[2] No due process question arises from this extension of legislation over such controlled areas such as was considered to bar state action concerning contracts made and to be performed beyond the boundaries of a state. Cf. Home Ins. Co. v. Dick, 281 U.S. 397, 407, with Alaska Packers Assn. v. Comm'n. 294 U.S. 532, 541.
[3] Cf. Ashwander v. T.V.A., 297 U.S. 288, 330, et seq.
[4] 55 Stat. 1560:

Article I, "(1) The United States shall have all the rights, power and authority within the Leased Areas which are necessary for the establishment, use, operation and defence thereof, or appropriate for their control, . . ."
Article XI, "(4) It is understood that a Leased Area is not a part of the territory of the United States for the purpose of coastwise shipping laws so as to exclude British vessels from trade between the United States and the Leased Areas." P. 1565.
Article XIII, "(1) The immigration laws of the Territory shall not operate or apply so as to prevent admission into the Territory, for the purposes of this Agreement, of any member of the United States Forces posted to a Leased Area or any person (not being a national of a Power at war with His Majesty the King) employed by, or under a contract with, the Government of the United States in connection with the construction, maintenance, operation or defence of the Bases in the Territory; but suitable arrangements will be made by the United States to enable such persons to be readily identified and their status to be established." P. 1565.
Article XIV, "(1) No import, excise, consumption or other tax, duty or impost shall be charged on 
.....
"(c) goods consigned to the United States Authorities for the use of institutions under Government control known as Post Exchanges, Ships' Service Stores, Commissary Stores or Service Clubs, or for sale thereat to members of the United States forces, or civilian employees of the United States being nationals of the United States and employed in connection with the Bases, or members of their families resident with them and not engaged in any business or occupation in the Territory;" P. 1566.
Article XXIX, "During the continuance of any Lease, no laws of the Territory which would derogate from or prejudice any of the rights conferred on the United States by the Lease or by this Agreement shall be applicable within the Leased Area, save with the concurrence of the United States." P. 1570.
There are also articles arranging for postal facilities and tax exemptions.
[5] 1 Malloy, Treaties, Conventions, International Acts, Protocols and Agreements (S. Doc. No. 357, 61st Cong., 2d Sess.) 359:

"While on the one hand the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the above described areas of land and water, on the other hand the Republic of Cuba consents that during the period of the occupation by the United States of said areas under the terms of this agreement the United States shall exercise complete jurisdiction and control over and within said areas with the right to acquire (under conditions to be hereafter agreed upon by the two Governments) for the public purposes of the United States any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof."
Id., 361. See Joint Resolution No. 24, April 20, 1898, on the recognition of the independence of Cuba, 30 Stat. 738; the Act of March 2, 1901, in fulfillment thereof, 31 Stat. 898, Art. VII; Treaty with Cuba proclaimed June 9, 1934, 48 Stat. 1682, 1683, Art. III.
[6] Isthmian Canal Convention, 33 Stat. 2234:

"The United States of America and the Republic of Panama being desirous to insure the construction of a ship canal across the Isthmus of Panama to connect the Atlantic and Pacific oceans, and the Congress of the United States of America having passed an act approved June 28, 1902, in furtherance of that object, by which the President of the United States is authorized to acquire within a reasonable time the control of the necessary territory of the Republic of Colombia, and the sovereignty of such territory being actually vested in the Republic of Panama, the high contracting parties have resolved for that purpose to conclude a convention and have accordingly appointed as their plenipotentiaries,  "
Id., 2235:
"Article III.
"The Republic of Panama grants to the United States all the rights, power and authority within the zone mentioned and described in Article II of this agreement and within the limits of all auxiliary lands and waters mentioned and described in said Article II which the United States would possess and exercise if it were the sovereign of the territory within which said lands and waters are located to the entire exclusion of the exercise by the Republic of Panama of any such sovereign rights, power or authority."
[7] Through the Joint Resolution of June 29, 1944, 58 Stat. 625, these provisions were effectuated in leases for 99 years by an agreement of March 14, 1947. 61 Stat. 2834, Treaties and International Acts No. 1611. The rights of control over the areas obtained by the United States from the Republic of the Philippines are quite similar to those obtained over the Bermuda base.
[8] The power of control over leased areas obtained by the United States through the above leases is not greater than that ordinarily exercised by sovereign lessees of foreign territory. See 34 American Journal of International Law 703; Lawrence, Principles of International Law (6th ed., 1915) 175; H.R. Doc. No. 1, 56th Cong., 2d Sess., 386; Oppenheim's International Law (6th ed. by Lauterpacht, 1947) 412-14. Oppenheim contains numerous illustrations of leases by an owner-state to a foreign power. His views upon the leases of the bases herein referred to correspond to that of our Department of State and to the postulate as to sovereignty stated in this opinion.
[9] E.g., 55 Stat. 1245, Executive Agreement Series 204 (Greenland); 56 Stat. 1621, Executive Agreement Series 275 (Liberia).
[10] Browder v. United States, 312 U.S. 335, 339; Barr v. United States, 324 U.S. 83, 90.
[11] Puerto Rico v. Shell Co., 302 U.S. 253, 257.
[12] Federal Employers' Liability Act, 35 Stat. 65, § 2, 45 U.S.C. § 52 (1908) ("Every common carrier by railroad in the Territories, the District of Columbia, the Panama Canal Zone, or other possessions of the United States. . . .");

Neutrality Act, 40 Stat. 231, § 1, 18 U.S.C. § 39 (1917) ("The term `United States' . . . includes the Canal Zone and all territory and waters, continental or insular, subject to the jurisdiction of the United States.");
Bank Conservation Act, 48 Stat. 2, § 202, 12 U.S.C. § 202 (1933) (". . . the term `State' means any State, Territory, or possession of the United States, and the Canal Zone.");
Federal Communications Act, 48 Stat. 1064, 1065, § 3 (g), as amended, 47 U.S.C. § 153 (g) (1934) ("`United States' means the several States and Territories, the District of Columbia, and the possessions of the United States, but does not include the Canal Zone.");
Food, Drug, and Cosmetic Act, 52 Stat. 1040, § 201 (a), 21 U.S.C. § 321 (a) (1938) ("The term `Territory' means any Territory or possession of the United States, including the District of Columbia and excluding the Canal Zone.");
Federal Firearms Act, 52 Stat. 1250, § 1 (2), as amended, 15 U.S.C. § 901 (2) (1938) ("The term `interstate or foreign commerce' means commerce between any State, Territory or possession (not including the Canal Zone), or the District of Columbia, and any place outside thereof; . . .");
Investment Company Act, 54 Stat. 795, § 2 (a) (37), as amended, 15 U.S.C. § 80a-2 (37) (1940) ("`State' means any State of the United States, the District of Columbia, Alaska, Hawaii, Puerto Rico, the Canal Zone, the Virgin Islands, or any other possession of the United States.");
Nationality Act, 54 Stat. 1137, § 101 (e), 8 U.S.C. § 501 (c) (1940) ("The term `outlying possessions' means all territory . .. over which the United States exercises rights of sovereignty, except the Canal Zone.");
War Damage Corporation Act, 56 Stat. 174, 176, § 2, 15 U.S.C. § 606b-2 (a) (1942) ("Such protection shall be applicable only (1) to such property situated in the United States (including the several States and the District of Columbia), the Philippine Islands, the Canal Zone, the Territories and possessions of the United States, and in such other places as may be determined by the President to be under the dominion and control of the United States. . . .").
The War Damage Corporation Act and the Defense Base Act, 56 Stat. 1035, 42 U.S.C. § 1651 (1942), infra, note 16, use terms different from "possession" to describe these leased areas. When these acts were passed, however, the problems posed by the bases were specifically considered by Congress. Hearings on H.R. 6382, House of Representatives, 77th Cong., 2d Sess., p. 27; 88 Cong. Rec. 1851. Thus they afford no touchstone as to the meaning of the Fair Labor Standards Act, where such problems were not specifically considered.
[13] United States v. Darby, 312 U.S. 100, 115:

"The motive and purpose of the present regulation are plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows."
Substandard conditions included excessive hours of labor. Overnight Motor Co. v. Missel, 316 U.S. 572, 577.
[14] Johnson v. United States, 163 F. 30, 32.
[15] When Congress dealt with coverage in the National Labor Relations Act, enacted July 5, 1935, 49 Stat. 449, 450, it used a narrower definition of commerce, one restricted to States and Territories. That has been held to cover Puerto Rico but we are not advised of any application to the bases. Cf. Labor Board v. Gonzalez Padin Co., 161 F.2d 353.
[16] Defense Base Act, 56 Stat. 1035, 42 U.S.C. § 1651 (1942). This act extends the coverage of the Longshoremen's and Harbor Workers' Compensation Act to "any employee engaged in any employment 

"(1) at any military, air, or naval base acquired after January 1, 1940, by the United States from any foreign government; or
"(2) upon any lands occupied or used by the United States for military or naval purposes in any Territory or possession outside the continental United States (including Alaska; the Philippine Islands; the United States Naval Operating Base, Guantanamo Bay, Cuba; and the Canal Zone);. . . ."
This extension was necessary because of the prior limited language of the Act which covered injuries "occurring upon the navigable waters of the United States," the term "United States" being defined to mean "the several States and Territories and the District of Columbia, including the territorial waters thereof." 44 Stat. 1424, 33 U.S.C. §§ 902, 903.
It will be noted that Guantanamo Bay and the Canal Zone were included in the lists as "possessions."
[1] This is the more striking because it is said concerning an Act which we have held does not, even in continental United States, exercise or purport to exercise the full scope of the commerce power. See, e.g., McLeod v. Threlkeld, 319 U.S. 491, 493; Kirschbaum Co. v. Walling, 316 U.S. 517.
[2] Section 6 of the Act requires every employer (as defined therein) to pay the prescribed rates to each employee who is "engaged in commerce or in the production of goods for commerce"; and § 7 forbids overtime employment, except at prescribed rates, of any employee who is "engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206, 207.
[3] On October 29, 1940, Major (General Staff) Freiherr von Falkenstein, from the Fuehrer's headquarters, wrote a secret "resume of the military questions current here." The 5th item thereof reads:

"The Fuehrer is at present occupied with the question of the occupation of the Atlantic Islands with a view to the prosecution of war against America at a later date. Deliberations on this subject are being embarked upon here. Essential conditions are at the present:
"a. No other operational commitment,
"b. Portuguese neutrality,
"c. Support of France and Spain.
"A brief assessment of the possibility of seizing and holding air bases and of the question of supply is needed from the GAF."
3 Nazi Conspiracy and Aggression (GPO 1946), p. 289; 3 Trial of Major War Criminals (GPO 1947), p. 389, Document No. 376-PS received in evidence Dec. 10, 1945; see Nazi Conspiracy and Aggression: Opinion and Judgment (GPO 1947), p. 45.
[4] "I understand that in the view of the American technical authorities modern conditions of war, especially air war, require forestalling action, in this case especially in order to prevent the acquisition by Hitler of jumping-off grounds from which it would be possible, bound by bound, to come to close quarters with the American Continent." Mr. Churchill to House of Commons, July 9, 1941. Churchill, "The Unrelenting Struggle," pp. 175-176.
[5] Stimson, "On Active Service in Peace and War," Vol. II, pp. 356-358.
[6] Hull, "Memoirs," p. 834; Stimson, "On Active Service in Peace and War," Vol. II, pp. 356-358.

The former points out, of the President, that "He also knew the penurious condition of the native populations of most of the islands, and consequently did not want to assume the burden of administering those populations. Therefore he had changed, during my absence from Washington, from his original idea of outright purchase of the bases to that of ninety-nine-year leases. I had originally favored outright cession, but was willing to agree to leases instead." P. 834.
[7] See Parliamentary Debates, Commons, Vol. 370, p. 255, et seq., and Vol. 376, p. 567, et seq.
[8] 55 Stat. 1560, 1572; Executive Agreement Series 235, Department of State (GPO 1942), pp. 14-15.
[9] Stimson, "On Active Service in Peace and War," Vol. II, p. 356.
[10] The following statutes use language expressly covering the leased bases or language which seems to imply that the statute will reach as far as there is power to make it reach:

I. Statutes which explicitly cover the leased bases:
55 Stat. 622, as amended, 42 U.S.C. § 1651 (1).
II. Statutes employing the phrase "places subject to the jurisdiction of the United States" or similarly sweeping language:
38 Stat. 270, as amended, 12 U.S.C. § 466; 58 Stat. 624, as amended, 10 U.S.C. Supp. I, § 1213; 56 Stat. 176, 15 U.S.C. § 606b-2 (a); 61 Stat. 512, 16 U.S.C. Supp. I, § 776a (c); 40 Stat. 231, 18 U.S.C. § 39; 35 Stat. 1136, 18 U.S.C. § 387; 35 Stat. 1138, as amended, 18 U.S.C. § 396; 54 Stat. 1134, as amended, 18 U.S.C. § 396a; 49 Stat. 494, 18 U.S.C. § 396b; 35 Stat. 1148, 18 U.S.C. § 511; 40 Stat. 559, as amended, 22 U.S.C. § 226; 42 Stat. 361, 22 U.S.C. § 409; 52 Stat. 631, as amended, 22 U.S.C. § 611 (m); 58 Stat. 643, 22 U.S.C. § 701; 32 Stat. 172, as amended, 46 U.S.C. § 95; Rev. Stat. § 4438a, as amended, 46 U.S.C. § 224a (6); 35 Stat. 1140, 46 U.S.C. § 1351; 40 Stat. 217, 219, as amended, 50 U.S.C. §§ 31, 37; 54 Stat. 1179, 50 U.S.C. App. § 512; 56 Stat. 177, as amended, 50 U.S.C. App. § 633 (4), (6); 56 Stat. 185, 50 U.S.C. App. § 643a; 58 Stat. 624, 50 U.S.C. App. § 777; 56 Stat. 390, 50 U.S.C. App. § 781; 60 Stat. 211, 50 U.S.C. App. § 1828 (c).
[11] The following tabulation of statutes whose coverage provisions are so similar to those being construed as to either be governed by today's decision or to require most sophisticated distinctions shows in what a network of legislation the Court is entangling the bases:

I. Statutes employing the term "possessions,"
(a) in the phrase "States, Territories, and Possessions" or the like:
43 Stat. 1070, as amended, 2 U.S.C. § 241 (i); 42 Stat. 998, 7 U.S.C. § 3; 42 Stat. 159, 7 U.S.C. § 182 (6); 49 Stat. 731, 7 U.S.C. § 511 (i); 30 Stat. 544, as amended, 11 U.S.C. § 1 (10); 48 Stat. 2, 12 U.S.C. § 202; 39 Stat. 601, as amended, 61 Stat. 786, 14 U.S.C. Supp. I, § 29; 55 Stat. 11, 12, as amended, 14 U.S.C. Supp. I, §§ 302, 307; 48 Stat. 882, as amended, 15 U.S.C. § 78 (c) (16); 54 Stat. 790, 15 U.S.C. § 80a-2 (37); 44 Stat. 1406, 15 U.S.C. § 402 (c); 44 Stat. 1423, 15 U.S.C. § 431; 47 Stat. 8, as amended, 61 Stat. 202, 15 U.S.C. Supp. I, § 607; 61 Stat. 515, 15 U.S.C. Supp. I, § 619; 52 Stat. 1250, as amended, 15 U.S.C. § 901 (2); 56 Stat. 1087, 18 U.S.C. § 420g (2); 42 Stat. 1486, 21 U.S.C. § 61 (b); 52 Stat. 1041, 21 U.S.C. § 321 (b); Int. Rev. Code §§ 22 (b) (4), 251, 252, 1621 (a) (8) (B), 813 (b); 49 Stat. 1928, 27 U.S.C. § 222 (a); 28 U.S.C. § 411 (a); 61 Stat. 150, 29 U.S.C. Supp. I, § 161 (2); 61 Stat. 86, 90, 29 U.S.C. Supp. I, §§ 252 (d), 262 (e); 29 U.S.C. App. Supp. I, § 203.7; 55 Stat. 179, 30 U.S.C. § 4o; 54 Stat. 1086, 31 U.S.C. § 123; Rev. Stat. § 3646, as amended, 31 U.S.C. § 528 (c); 61 Stat. 787, 33 U.S.C. Supp. I, §§ 883a, 883b; 44 Stat. 900, as amended, 39 U.S.C. § 654 (c); 49 Stat. 2038, 41 U.S.C. § 39; 58 Stat. 682, as amended, 42 U.S.C. § 201 (g); 49 Stat. 624, as amended, 42 U.S.C. § 405 (d); 50 Stat. 888, 42 U.S.C. § 1402 (12); 60 Stat. 774, 42 U.S.C. § 1818; 35 Stat. 65, 45 U.S.C. § 52; 52 Stat. 1107, as amended, 45 U.S.C. § 362; 45 Stat. 1492, as amended, 46 U.S.C. § 85; 49 Stat. 888, 46 U.S.C. § 88; Rev. Stat. § 4472, as amended, 46 U.S.C. § 170; Rev. Stat. § 4370, 46 U.S.C. § 316 (a); 41 Stat. 996, as amended, 46 U.S.C. § 813; 39 Stat. 735, 46 U.S.C. §§ 819, 823, 826, 829; 40 Stat. 901, as amended, 46 U.S.C. § 835 (a), (d); 41 Stat. 998, 46 U.S.C. §§ 880, 882, 883; 41 Stat. 1003, 46 U.S.C. § 951; 49 Stat. 2016, 46 U.S.C. § 1244 (a), (b); 49 Stat. 1212, 46 U.S.C. § 1312; 48 Stat. 1065, as amended, 47 U.S.C. § 153 (e), (g); 48 Stat. 1084, 47 U.S.C. § 308 (c); 48 Stat. 1087, 47 U.S.C. § 314; 44 Stat. 568, 572, 573, 49 U.S.C. §§ 171, 176 (c), 179; 52 Stat. 977, 979, 980, 984, 998, 49 U.S.C. §§ 401 (3), (21) (b), (29), (30), 425, 486; 40 Stat. 415, as amended, 50 U.S.C. App. § 5; 60 Stat. 50, as amended, 50 U.S.C. App. § 32 (a) (2) (B); 54 Stat. 890, as amended, 50 U.S.C. App. § 308; 61 Stat. 31, 32, 50 U.S.C. App. Supp. I, §§ 324, 326 (a) (2), (3); 54 Stat. 859, as amended, 50 U.S.C. Supp. I, § 403 (b) (A); 56 Stat. 777, 50 U.S.C. App. § 574; 59 Stat. 542, 50 U.S.C. App. § 639a; 56 Stat. 182, as amended, 50 U.S.C. App § 640; 55 Stat. 206, 50 U.S.C. App. § 702; 56 Stat. 461-62, 50 U.S.C. App. §§ 791, 792, 793, 801; 56 Stat. 1041, 50 U.S.C. App. § 846; 56 Stat. 23, as amended, 50 U.S.C. App. § 901; 56 Stat. 245, as amended, 50 U.S.C. App. § 1191 (i); 57 Stat. 162, as amended, 50 U.S.C. App. § 1472 (a) (A);
(b) qualified, usually in a similar phrase, by the word "island" or "insular":
54 Stat. 1137, 1139, 8 U.S.C. §§ 501 (e), 604; 59 Stat. 526, as amended, 12 U.S.C. Supp. I, § 635; 38 Stat. 730, 15 U.S.C. § 12; 48 Stat. 74, as amended, 15 U.S.C. § 77b (6); 61 Stat. 726, 16 U.S.C. Supp. I, § 758a; 56 Stat. 1046, 21 U.S.C. § 118d; 56 Stat. 1063, 22 U.S.C. § 672 (b); Int. Rev. Code §§ 2563, 2602, 2733 (g); 49 Stat. 2011, as amended, 46 U.S.C. § 1204; 40 Stat. 388, 50 U.S.C. § 137; 53 Stat. 812, 50 U.S.C. § 98f.
II. Statutes listed under heading I above, the application of which to the leased bases might cause conflict with Bermudian law:
42 Stat. 998, as amended, 7 U.S.C. § 3 (Commodity Exchange Act); 42 Stat. 159, 7 U.S.C. § 182 (6) (Packers and Stockyards Act, 1921); 49 Stat. 731, 7 U.S.C. § 511 (i) (Tobacco Inspection Act); 54 Stat. 1139, 8 U.S.C. § 604 (Nationality Act of 1940); 59 Stat. 526, as amended, 12 U.S.C. Supp. I, § 635 (Export-Import Bank Act of 1945); 55 Stat. 11, 12, as amended, 14 U.S.C. Supp. I, §§ 302, 307 (Coast Guard Reserve Act); 38 Stat. 730, 15 U.S.C. § 12 (Clayton Act); 42 Stat. 1486, 21 U.S.C. § 61 (b) (Filled Milk Act); 56 Stat. 1063, 22 U.S.C. § 672 (b) (Settlement of Mexican Claims Act); Int. Rev. Code §§ 22 (b) (4), 813 (b); 29 U.S.C. App. Supp. I, § 203.7 (Rules and Regulations implementing the National Labor Relations Act as amended by the Labor Management Relations Act); 49 Stat. 624, as amended, 42 U.S.C. § 405 (d) (Subpoena provision of the Federal Old-Age and Survivors Insurance Benefits Act); 50 Stat. 888, 42 U.S.C. § 1402 (Low Rent Housing Act); 60 Stat. 774, 42 U.S.C. § 1818 (Atomic Energy Act); 35 Stat. 65, 45 U.S.C. § 52 (Federal Employers' Liability Act); 52 Stat. 1107, as amended, 45 U.S.C. § 362 (Railroad Unemp. Ins. Act); Rev. Stat. § 4370, as amended, 46 U.S.C. § 316 (a) Act for the Regulation of Vessels in Domestic Commerce); 41 Stat. 999, 46 U.S.C. § 883 (Merchant Marine Act, 1920); 49 Stat. 2017, 46 U.S.C. § 1244 (a) (Merchant Marine Act, 1936); 49 Stat. 1212, 46 U.S.C. § 1312 (Carriage of Goods by Sea Act); 48 Stat. 1065, 1084, 1087, as amended, 47 U.S.C. §§ 153 (e), (g), 308 (c), 314 (Communications Act of 1934); 44 Stat. 568, 572, 573, as amended, 49 U.S.C. §§ 171, 176 (c), 179 (b) (Air Commerce Act of 1926); 52 Stat. 977, 49 U.S.C. § 401 (3), (21) (b), (29), (30) (Civil Aeronautics Act); 52 Stat. 998, 49 U.S.C. § 486 (same); 56 Stat. 182, 50 U.S.C. App. § 640 (Amendment of Nationality Act of 1940); 55 Stat. 206, 50 U.S.C. App. § 702 (Exportation Restriction Act); 56 Stat. 23, as amended, 50 U.S.C. App. § 901 (Emergency Price Control Act of 1942).
[12] The State Department's Legal Adviser, in a letter to the Attorney General dated January 30, 1948, wrote, in part, as follows:

"The Department regards as unfortunate the conclusion of the Court [of Appeals] that the U.S. exercises as complete control in the leased areas as in other areas long known as `possessions' of the U.S., and its specific reference in this connection to the Philippine Islands, Swains Island, Samoa, Guam and the guano islands over all of which the U.S. exercises sovereignty, except the Philippines ovev which sovereignty was exercised until they were given their independence on July 4, 1946, and except the guano islands, over which, in general, the U.S. exercises exclusive jurisdiction and no other nation claims sovereignty.
"Any holding that the bases obtained from the Government of Great Britain on 99 year leases are `possessions' of the United States in a political sense would not in the Department's view be calculated to improve our relations with that Government. Moreover, such a holding might very well be detrimental to our relations with other foreign countries in which military bases are now held or in which they might in the future be sought. . .."
[13] 33 Stat. 2234, 2235.
[14] Secretary Hughes to the Panamanian Minister, Oct. 15, 1923, 2 Hackworth, Digest of International Law, pp. 801-805.
[15] Joint Statement of President Roosevelt and President Arias, Oct. 17, 1933, id., 806 et seq.; General Treaty and Supplementary Conventions of March 2, 1936, ratified July 26, 1939, 53 Stat. 1807.
[16] The other subparagraphs provide that the United States must conform to the local system of lights and other navigation aids, and report in advance to local authorities any such devices established or changed; that the United States is exempt from local pilotage laws; that British commercial vessels may use the leased areas on the same basis as American commercial vessels; and that commercial United States aircraft cannot operate from the bases for other than military purposes except by agreement with the United Kingdom.
[17] President Wilson, in a message delivered in person to the Congress (51 Cong. Rec. 4313), said:

"Whatever may be our own differences of opinion concerning this much debated measure, its meaning is not debated outside the United States. Everywhere else the language of the treaty [with Great Britain] is given but one interpretation, and that interpretation precludes the exemption I am asking you to repeal.
"We consented to the treaty [with Great Britain]; its language we accepted, if we did not originate; and we are too big, too powerful, too self-respecting a Nation to interpret with too strained or refined a reading the words of our own promises just because we have power enough to give us leave to read them as we please. The large thing to do is the only thing that we can afford to do, a voluntary withdrawal from a position everywhere questioned and misunderstood.
"We ought to reverse our action without raising the question whether we were right or wrong, and so once more deserve our reputation for generosity and for the redemption of every obligation without quibble or hesitation.
"I ask this of you in support of the foreign policy of the administration. I shall not know how to deal with other matters of even greater delicacy and nearer consequence if you do not grant it to me in ungrudging measure."
[18] After hearings, the House Committee recommended passage. House Report No. 362, 63d Cong., 2d Sess. Three separate minority reports, reflecting the views of four Committee members, were filed. Id. The Senate Committee heard testimony covering more than one thousand pages. Hearings on H.R. 14385, Senate Committee on Interoceanic Canals, 63d Cong., 2d Sess. The issue was so explosive that the measure was reported back without recommendation. S. Rep. No. 469, 63d Cong., 2d Sess. The measure was debated for five days in the House, 51 Cong. Rec., Pt. 6, 5554-5602; 5605-5640; 5677-5767; 5797-5897; 5922-6089, and more than a month in the Senate, 51 Cong. Rec., Pt. 8, 7660-7667; 7723-7727; 8155-8172; 8211-8229; 8277-8284; 51 Cong. Rec., Pt. 9, 8335-8340; 8428-8446; 8493-8507; 8548-8560; 8638-8642; 8693-8707; 8730-8741; 8803-8824; 8867; 8875-8888; 8941-8956; 9003-9031; 9209-9214; 9215-9243; 9291-9297; 51 Cong. Rec., Pt. 10, 9355-9365; 9435-9446; 9509-9526; 9626-9631; 9713-9722; 9723-9745; 9784-9788; 9916-9929; 9977-10008; 10041-10086; 10127-10174; 10195-10210; 10211-10248. See also Extension of Remarks at 51 Cong. Rec., Pt. 17, pp. 252-253; 253-255; 258-263; 266-270; 279-280; 280; 280-281; 281-282; 282-290; 290-292; 292-294; 295-296; 296-298; 298; 298-299; 299-303; 306-307; 307-309; 309-315; 316-319; 319-324; 324-331; 331-333; 333-334; 334-335; 335; 335-339; 339-340; 352-353; 353-356; 370-372; 418-428; 539-543; 610-617; 644-645; 645-646; 646-647; 650.

The repealer was passed as the Act of June 15, 1914, c. 106, 38 Stat. 385. See annotations in 48 U.S.C.A. §§ 1315, 1317.
[19] 35 Op. Atty. Gen. 536, 540-541.
[20] See United Nations, Non-Self-Governing Territories, Summaries of Information Transmitted to the Secretary-General during 1946 (UN, 1947), p. 101.
[21] Wage & Hour Manual (1942 ed.) 30; 12 Fed. Reg. 4583-4584; 29 C.F.R. 1947 Supp., § 776.1.
[22] See note 21. See also Administrator's Letter dated May 22, 1942, stating that the Act does not apply to bases in the "British West Indies" and Deputy Administrator's Letter dated September 24, 1943, with specific reference to the leased area on Trinidad.
[23] (a) In 1941 Congress sought to extend to the leased bases the provisions of the Longshoremen's and Harbor Workers' Compensation Act which covered death or disability from an injury occurring upon the navigable waters of the United States. The "United States" was therefore defined to mean "the several States and Territories and the District of Columbia, including the territorial waters thereof." 44 Stat. 1424, 33 U.S.C. § 902. The amendment, c. 357, 55 Stat. 622, made the Act applicable to injuries or death of covered employees at any military, air or naval base acquired after January 1, 1940, by the United States from any foreign government or any lands occupied or used by the United States for military or naval purposes in any Territory or possession outside the continental United States, including Alaska, Guantanamo, and the Philippine Islands. This Act was amended in 1942, c. 668, 56 Stat. 1028, 1035, and, as amended, lists separately (1) bases acquired from foreign governments after January 1, 1940, and (2) lands used for military or naval purposes and any Territory or possession, including Alaska, the Philippines, Guantanamo, and the Canal Zone. It is clear that in neither 1941 nor 1942 did the Congress consider that the term "possession" alone would have extended coverage to the bases.

(b) The Act of March 27, 1942, c. 198, 56 Stat. 174, designed to extend War Damage protection provides that such protection shall be applicable only (1) to property situated in the United States (including the several States and the District of Columbia), the Philippine Islands, the Canal Zone, the territories and possessions of the United States, and in such other places as may be determined by the President to be under the dominion and control of the United States. The terms of this Act, and its legislative history, indicate that the final clause was added to cover areas such as these bases. If the Congress had considered areas of this kind to be "possessions" such a clause would scarcely have been necessary.
[24] More than 100 years ago, Mr. Chief Justice Marshall, speaking for a unanimous Court in Foster v. Neilson, 2 Pet. 253, 307-309, said: ". . . In a controversy between two nations concerning national boundary, it is scarcely possible that the courts of either should refuse to abide by the measures adopted by its own government. .. . The judiciary is not that department of the government, to which the assertion of its interests against foreign powers is confided; and its duty commonly is to decide upon individual rights, according to those principles which the political departments of the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous. . . .

"After these acts of sovereign power over the territory in dispute, asserting the American construction of the treaty by which the government claims it, to maintain the opposite construction in its own courts would certainly be an anomaly in the history and practice of nations. If those departments which are entrusted with the foreign intercourse of the nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights of dominion over a country of which it is in possession, and which it claims under a treaty; if the legislature has acted on the construction thus asserted, it is not in its own courts that this construction is to be denied.. . ."
In an earlier case, The Amiable Isabella, 6 Wheat. 1, 71, Mr. Justice Story had said: "In the first place, this Court does not possess any treaty-making power. That power belongs by the constitution to another department of the Government; and to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. . . ."
If, as Mr. Chief Justice Marshall stated, this Court should not, to deny rights asserted by the Executive, place a different interpretation on an agreement with another nation, a fortiori, it should not do so in order to assert rights which not only are not asserted by our Executive or by the Congress, but are denied by them and by the other sovereign involved. And, to add, to the agreement under which we occupy the leased areas, that as a matter of law the bases have become our possessions, is certainly more than a trivial change in that agreement, in direct contravention of the caution by Mr. Justice Story.
[25] See, e.g., the statutes mentioned in note 23.
[26] Section 3 (d) of the Act provides that the term "employer" shall not include the United States. 29 U.S.C. § 203 (d).
[27] See President Wilson's message quoted note 17; and see note 24.
[28] Since the District Court entered summary judgment before trial based on a ruling that the leased area is not a possession of the United States, I assume that this Court's affirmance of the reversal of that ruling leaves open on remand all other questions relevant to respondents' right of recovery, such as whether or not they were engaged in commerce or in the production of goods for commerce, as well as any defenses which may be available to petitioner.