Petition of **BLOOMFIELD STEAMSHIP COMPANY**, as Owner of the **LUCILE BLOOMFIELD**, for exoneration from or limitation of liability.

Petition of **A/S J. LUDWIG MOWINCKELS REDERI**, as Owner of the **MOTOR VESSEL RONDA**, for exoneration from or limitation of liability.

**BLOOMFIELD STEAMSHIP COMPANY, Plaintiff,**

v.

**A/S J. LUDWIG MOWINCKELS REDERI, Defendant.**

Nos. 64 Ad. 303, 64 Ad. 306 and 66 Civ. 3575.

United States District Court S. D. New York.

April 11, 1969.

Eikel & Goller, Houston, Tex., and Healy & Baillie, New York City, for Bloomfield Steamship Co., Robert Eikel, Houston, Tex., Thomas L. Rohrer and J. Edward Davey, Jr., New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for cargo claimants; Donald Waesche, Jr., and Douglas A. Jacobsen, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for A/S J. Ludwig Mowinckels Rederi; Richard Ashworth and Charles S. Haight, Jr., New York City, of counsel.

## OPINION

MacMAHON, District Judge.

The SS Lucile Bloomfield ("Bloomfield"), owned by the Bloomfield Steamship Company, collided with the M/V Ronda, owned by A/S J. Ludwig Mowinckels Rederi, in international waters outside LeHavre, France on October 1, 1963. The Bloomfield, outbound, continued on her voyage to Antwerp. The Ronda, inbound, proceeded to LeHavre where she capsized the following day. Her entire cargo, valued at over $2 million, was lost.

The petitions of both vessels for exoneration from, or limitation of, liability have already been consolidated, and we grant the Bloomfield's post-trial motion for consolidation of her action against the Ronda for collision damages. Since the Ronda has already settled with cargo claimants, the questions presented for decision are limited to whether the Bloomfield is entitled to exoneration from, or limitation of, liability and to whether the Ronda is liable to the Bloomfield for collision damages and for indemnification for claims asserted against the Bloomfield by the cargo claimants in this proceeding.

■ The legal ramifications of this collision have been litigated in a number of jurisdictions. The English courts have held, in a suit commenced by the Ronda against the Bloomfield, that both vessels are jointly liable for the collision and consequent loss of the Ronda.[1] The Ronda and cargo claimants argue that the English judgments should collaterally estop the Bloomfield from relitigating the issue of her liability. The competency of the English courts to determine liability on the part of both vessels has not been challenged. We therefore hold that the English judgments bar a relitigation of the issue of liability between the parties to those judgments, the Ronda and the Bloomfield.[2]

In light of the recently developing case law removing the barrier of mutuality of estoppel,[3] we also hold that the English judgments bar a relitigation of the issue of liability between the Bloomfield and cargo claimants.

■ These propositions, however, were presented to us by motion for summary judgment on the eve of trial. The cases are complex, have been pending in this court for more than five years and already have been litigated in many other tribunals. The availability of collateral

1. The Lucile Bloomfield, [1966] 2 Lloyd's List L.R. 239 (Adm.), appeal dismissed, [1967] 1 Lloyd's List L.R. 341 (Ct. of App.) ; The Lucile Bloomfield, [1967] 2 Lloyd's List L.R. 308 (Adm.).

2. British Transport Comm'n v. United States, 354 U.S. 129, 154, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957); Hilton v. Guyot, 159 U.S. 113, 202–203, 16 S.Ct. 139,

40 L.Ed. 95 (1895); The "Benefactor" S.S. Co. v. Mount, 103 U.S. 239, 243, 26 L.Ed. 351 (1880).

3. Zdanok v. Glidden Co., etc., 327 F.2d 944 (2d Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); B. R. DeWitt, Inc. v. Hall, 19 N.Y.2d 141, 278 N.Y.S.2d 596, 225 N.E.2d 195 (1967).

estoppel to a nonparty to the former judgment is an evolving, rather than an established, doctrine. The judicial time and effort necessary to thorough analysis of the facts as a prerequisite to summary judgment would equal or exceed the time and effort necessary for trial and decision. Summary judgment, with ever-lurking issues of fact, is always a treacherous shortcut and, in cases like these, too fragile a foundation for so heavy a load. Such relief is always discretionary, and in cases posing complex issues of fact and unsettled questions of law, sound judicial administration dictates that the court withhold judgment until the whole factual structure stands upon a solid foundation of a plenary trial where the proof can be fully developed, questions answered, issues clearly focused and facts definitively found.[4] These considerations impelled us to deny the motion for summary judgment and to proceed to trial with a view to bringing finality to this already protracted litigation.

The cases essentially raise four questions, and we will consider them in the following sequence: (1) liability for the collision; (2) post-collision liability; (3) limitation of liability and (4) Bloomfield's claims against the Ronda.

## LIABILITY FOR THE COLLISION

■ In mid-evening on October 1, 1963, the Bloomfield left the port of LeHavre outbound for Antwerp. A pilot was aboard conning the vessel. The Bloomfield left the breakwaters of Le-Havre at 2159 proceeding on a westerly course at an estimated speed of 11 knots.

Captain Webb of the Bloomfield first sighted a ship, later identified as the inbound Ronda, when the Bloomfield was approaching the A1–B1 entrance buoys to LeHavre. He estimated the Ronda was four or five miles away, 10° off the Bloomfield's port bow, about one and one-half to two miles southeast of the LeHavre light vessel.[5] All estimates of the distance and bearing of the Ronda were visual. At no time were bearings taken by instruments, although the Bloomfield had fully operative radar equipment aboard.[6]

The Bloomfield then proceeded under a slow ahead order along a westerly course aiming for the position where she was to disembark the pilot. The point was midway between B1 and C2 buoys. The Bloomfield was moving along at approximately nine or ten knots with the foul ground on its port side. Before reaching the pilot vessel, the Bloomfield proceeded under a stop bell for five minutes.

The Bloomfield now made ready to disembark the pilot by making a slow turn to starboard, and at completion was heading about 10° east of north, dead in the water. The Bloomfield did not signal to indicate the starboard turn.[7] According to Captain Webb's testimony, the turn altered the Bloomfield's course in relation to the Ronda from a starboard passing to a crossing situation.[8] Captain Webb and the pilot once again sighted the Ronda. They could see her mast lights and range lights open and could also see her green side lights. They estimated that the Ronda was about one and one-half miles away and 45°, or four points, off the Bloomfield's port bow. No estimate was made of her speed.[9]

Captain Webb and the pilot then left the bridge. Captain Webb took a position on the forward extreme of the star-

4. Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); Koleinimport "Rotterdam" N.V. v. Foreston Coal Export Corp., 283 F. Supp. 184 (S.D.N.Y.1968); Boston & Maine R.R. v. Lehigh & N. E. R.R., 188 F.Supp. 486 (S.D.N.Y.1960), appeals dismissed, 287 F.2d 678 (2d Cir. 1961); United States v. Bethlehem Steel Corp., 157 F.Supp. 877 (S.D.N.Y.1958); 6

Moore, Federal Practice ¶ 56.15 [6] (2d ed. 1966).

5. Trial Transcript ("Tr."), p. 32.

6. Tr. 63.

7. Tr. 36–38.

8. Tr. 57–59.

9. Tr. 37–38.

board bow in order to watch the pilot descend into the pilot boat. There were floodlights rigged behind him focusing on the ladder and pilot boat and booms and rigging in front, making it virtually impossible for him to keep a watch on the Ronda.[10] He neither ordered, nor was there given to him, a report from the lookout, stationed further forward in the bow, as to the bearing of the Ronda.[11]

Approximately four or five minutes after the pilot left the bridge, Captain Webb once again sighted the Ronda. He observed that the mast lights and range lights had opened further, and he also observed the green side lights. He estimated the Ronda to be one-half mile away still four points off the port bow.[12] He then became apprehensive that a collision was imminent and became concerned that the Ronda was not reacting in full appreciation of the danger.[13] He did not, however, blow the danger signal.[14] The captain admitted on cross-examination that at this point, the vessels may well have been on a course that would have allowed them to pass without colliding if the Bloomfield had remained dead in the water.[15] It all depended, he stated, on their proximity, and since the sightings were all visual he could not be sure of the exact distance separating the two vessels.[16]

Concerned about the imminence of a collision and not certain about the proximity of the two vessels, he ordered a hard right in order to allow the vessels to pass parallel. The Bloomfield sounded one blast indicating a turn to starboard. It was answered immediately with a two-blast signal. The captain then quickly ordered full astern and the Bloomfield blew a three-blast signal.[17] One minute later, the ships collided.

Captain Webb estimated the speed of the Bloomfield at one or two knots astern and the Ronda at six or eight knots forward at the time of the collision. He further estimated that the angle of collision was 80° between the starboard bow of the Ronda and the port bow of the Bloomfield.[18]

The ships remained together for less than a minute. The Bloomfield put her lights on the Ronda, exchanged identification by radio and offered assistance. The Bloomfield, after ascertaining the extent of her damage, proceeded on her voyage to Antwerp.[19]

The Ronda, in the period of time immediately prior to the collision, was proceeding inbound to pick up a pilot in order to enter LeHavre. Her course was 125° true, 126° by gyro. The captain laid out a course of 109° true, 110° by gyro.[20] Feeling pain from a knee injury sustained on a prior voyage, he decided to go below and instructed the second officer to call him when the vessel was approaching the LeHavre–2 light buoy, in the vicinity of the pilot ship. The time was 2200; he did not return to the bridge until 2210.[21]

Upon returning to the bridge, the captain ordered full ahead, followed within thirty seconds by slow ahead. Also upon his return at 2210, the captain ordered the lookout to leave his post to aid in the pickup of the pilot. So, from 2210 until collision, it is undisputed that the ship did not have a lookout either on the forecastle head or on the bridge. It is equally undisputed, indeed admitted, that during this period no one else reported to the captain as to the distance and bearing of any ship.[22] The Ronda, a mile north of the LeHavre–2 light buoy, was proceeding toward the pilot vessel in-

10. Tr. 69–70.

11. Tr. 68.

12. Tr. 71.

13. Tr. 71–73.

14. Tr. 73.

15. Tr. 78–81.

16. Tr. 79.

17. Tr. 42–44.

18. Tr. 44–46.

19. Tr. 48.

20. Deposition of Captain Hansen ("Hansen"), p. 107.

21. Hansen 107–108.

22. Hansen 111–112.

tending to keep the vessel 15° to 20° on her starboard bow in order to negotiate a turn to allow the pilot to board on her starboard or lee side.[23]

At this point, at 2210,[24] Captain Hansen first observed the green side lights of a vessel, later identified as the Bloomfield. The lights were passing across the Ronda's bow from port to starboard, and he assumed erroneously that the vessel was going to make a left turn and proceed to the LeHavre light vessel. If such a turn had been made, it is Captain Hansen's opinion that the vessels would have passed parallel without danger of collision. Neither the captain nor any other member of the crew, however, made any check on the position or movements of the Bloomfield to ascertain whether she was actually maneuvering to a left turn.

The Ronda was proceeding under a slow order, modified to dead slow at 2219 or 2220 and changed to a stop at 2220. The stop was made to prepare to take the pilot aboard. The preparations were, however, interrupted by the captain's observation of the Bloomfield bearing down on the Ronda's starboard bow, approximately 300 feet away.[25]

Captain Hansen's testimony is, at this point, somewhat confusing, but it seems that he first heard a one-blast whistle signal and in response ordered a left turn and a two-blast signal. This was followed immediately by an order to go astern and a three-blast signal by both vessels.[26]

The Ronda's engine room and bridge logs are in disagreement as to the time of the collision, one recording it at 2223, and the other at 2224. According to Captain Hansen, the Ronda's bow at the time of the impact was heading about 10° or 15° to port, that is, away from the Bloom-

field, with the Ronda bearing a few degrees south of east and the Bloomfield bearing north. Captain Hansen estimates the angle of collision as approximately 90°.[27]

We find the Bloomfield at fault in a number of particulars.

First, the relative distances between the two vessels, as estimated by Captain Webb, were, by his own admission, inaccurate, as were the estimates of the relative bearings of the Ronda. The admission was unavoidable, for the captain conceded that it was difficult, almost impossible, to estimate distances and positions on a dark night.[28] Moreover, the relative distances he estimated at various points could never have been transversed in the time intervals recorded in the ship's logs and at the speed he estimated for both vessels.[29] In a lame attempt to explain this physical impossibility, he fell back on an assertion that the time notations were inaccurate.[30] If the captain had had a precise measurement of the bearing and distance of the Ronda in relation to the Bloomfield, he would have been able to know, rather than speculate, whether to remain dead in the water or to maneuver in order to avoid collision.[31] He chose to speculate, for radar equipment was available and operative, but he never used it.[32]

Second, although the Ronda was in sight, the Bloomfield did not signal when she turned to starboard to make a lee for the pilot. Captain Webb testified that in making this turn the Bloomfield was altering her course relative to the Ronda from a green to green starboard passing to a crossing situation.[33] Rule 22 of the International Rules of the Road requires a one-blast signal when turning to starboard and across the course of a ship in sight. Captain Webb testified

23. Hansen 113.
24. Hansen 113–114.
25. Hansen 120.
26. Hansen 121.
27. Hansen 122–123.
28. Tr. 63, 75.
29. Tr. 64–66, 74–77.
30. Tr. 66.
31. Tr. 76–77, 79–81.
32. Tr. 51–52.
33. Tr. 55.

that it was not the custom to signal in such a manner while entering and leaving LeHavre.[34] Captain John W. Anderson, former master of the SS United States, who had navigated into and out of LeHavre during 1963, testified, however, that there were no special customs on whistles in LeHavre and that the International Rules of the Road were followed in that port.[35] We accept that testimony and find that the International Rules of the Road did apply and that the Bloomfield violated Rule 22.

Third, the Bloomfield did not keep a proper lookout during the critical five minutes when the captain left the bridge to observe the pilot descend into the pilot boat. The captain placed himself in a position where it was impossible for him to observe the Ronda's bearing and distance. Although a lookout was on duty, he was neither ordered to observe the Ronda, nor did he report on his own initiative, nor did anyone else.[36] The Bloomfield thus failed to keep a proper lookout.

Fourth, the Bloomfield was at fault in ordering a hard right rudder when she could see that the range lights of the Ronda were well open on her starboard bow, indicating a clear passage if both vessels held their course.[37]

Finally, we find the Bloomfield at fault in not giving the danger signal when Captain Webb became concerned that the Ronda was not reacting with a full appreciation of the danger of collision.[38]

As to the Ronda, we find that she was also at fault in three respects. First, she was without a lookout for fourteen minutes, from 2210 to 2224, the time of collision.[39] We further find that from the sighting of the Bloomfield at 2210 until the observation of the Bloomfield 300 feet off the Ronda's starboard bow, Captain Hansen paid no attention whatever to the movements of the Bloomfield. Instead, he erroneously assumed the Bloomfield would make a left turn to proceed to the light vessel and navigated his ship accordingly, but at no time within this critical period did he observe the Bloomfield.[40] Finally, we find that during this critical period no one else reported on the position of the Bloomfield, nor, in fact, did anyone aboard the Ronda, including the captain, pay any attention whatever to the Bloomfield until it was too late to avoid a collision.[41]

We conclude, therefore, that both the Bloomfield and the Ronda were navigated negligently and that this joint negligence was the proximate cause of their collision.

## POST-COLLISION LIABILITY

The Bloomfield argues, however, that even if she were liable for the collision, the proximate cause of the Ronda's loss from capsizing was not the negligence of the Bloomfield but the post-collision negligence and unseaworthy condition of the Ronda. We, therefore, turn to consider the actions of the Ronda after the collision.

The collision occurred six miles from LeHavre. Immediately after the collision, the Ronda was listing from 3° to 5°, her draft forward was 26 feet, and there was a large breach significantly below the water level. According to the chief officer's report to the captain, the ship was tight except for water entering the number two lower hold.[42]

The pilot came aboard at 2235, and Captain Hansen told him about this damage. The captain then sent his first of-

34. Tr. 58.
35. Tr. 198–199.
36. Tr. 68–70.
37. Tr. 78–79.
38. Tr. 72–73; Rules 22 and 28, International Rules of the Road, 33 U.S.C. §§ 146f and 147.
39. Hansen 388–391.
40. Hansen 460–461, 464–465.
41. Hansen 462.
42. Hansen 124.

ficer forward to keep watch and report on the draft forward and the damage.[43] The chief officer later reported that number two hold was taking water but that number one hold was dry and that the bulkhead between them was tight.[44] Based on the size of the breach, the ship's list, the distance from the shore and the choppy condition of the sea, Captain Hansen decided to make an attempt to reach port rather than patch the breach at sea.[45] The ship got under way at 2245. The vessel proceeded at slow ahead in order to put the least strain on the breach. The captain told the pilot to order a salvage vessel with a large pumping capacity to come out to the ship as soon as possible and stand by to assist.[46]

The ship proceeded and, according to Captain Hansen, the list and draft forward stabilized at 5° to 8° and 30 feet, respectively.[47] Two tugs met the Ronda at 2311, and shortly thereafter the large salvage tug requested, the Abeille XII, also arrived.[48] The ship was assigned by the harbor master to Pier Mole Centrale. The captain decided to moor the Ronda with the port side against the pier in order to give greater access to the breached starboard side and also to utilize the mooring lines as supports for the ship.[49] The Abeille XII assisted the Ronda in mooring.[50]

Approximately fifteen minutes after mooring, the captain and others inspected the damage and observed that all holds were still watertight except for the number two lower hold. The captain ordered the tug to remain ready for pumping and told the pilot that no more tugs were presently needed. The captain was of the opinion at this time that the ship would remain afloat until the morn-

ing when she could be brought into dry-dock for repairs.[51]

Captain Hansen was informed at 0042 or 0043 that the bulkhead between lower holds one and two had cracked and that water was entering number one. The pump from lower hold number two was switched to number one and put in operation. The Abeille XII was ordered to commence pumping operations in number one hold. The captain also requested mobile pumps, but none were available on shore.[52]

The captain then decided to evacuate passengers. Before the evacuation could be commenced, Captain Hansen and the others felt the ship lurch forward and go down by the head. They also observed a great amount of water in number one hold. The Abeille XII pulled away, and the passengers were disembarked.[53] Cargo was removed from the number four hold in order to attempt to trim the ship and to build a dam in number one hold to ward off the water. The dam, however, did not hold. Captain Hansen, in a last effort to save his ship, decided at 0430 to burn two holes into the ship's starboard side in order to let out water. The men aboard the tug began to burn the holes, but the water level was so high that the effort was futile.[54] The vessel capsized at 0700.[55]

■ The Bloomfield grounds her contention that Captain Hansen was negligent in his attempt to salvage the Ronda by asserting errors of judgment on his part. The Bloomfield argues, first, that Captain Hansen was negligent in failing to attempt temporary repairs at sea. We find that the area where the ships collided was approximately six miles from LeHavre and the seas were

43. Hansen 127.

44. Hansen 127–128.

45. Hansen 134.

46. Hansen 131.

47. Hansen 413–415.

48. Hansen 137–138.

49. Hansen 147–149.

50. Hansen 149.

51. Hansen 157, 159, 162.

52. Hansen 166–170.

53. Hansen 171–172.

54. Hansen 173–175.

55. Hansen 177.

choppy.[56] We also find that the list was 3° to 5°, the draft forward approximately 25 feet, and the ship watertight except for the number two lower hold.[57] We conclude, therefore, that the captain was acting reasonably in deciding to proceed to port rather than attempt repairs at sea.

The Bloomfield also asserts that Captain Hansen was at fault in not personally checking the damage from the time of collision until after mooring his ship at the pier. We find that he instructed his chief officer to make continuous reports to him on the conditions of lower holds number one and two [58] and that he instructed his first officer to remain on the forecastle head in order to report to him on the draft forward.[59] It was absolutely necessary that the vessel be navigated slowly and carefully so as not to place any undue stress on the bulkhead between lower holds number one and two.[60] Since Captain Hansen was receiving reports on the damage and draft forward from officers whose qualifications have not been challenged, we conclude that he was acting prudently by remaining on the bridge. Indeed, in the circumstances, we think it would have been negligent for him to leave the bridge to check the damage himself.

The Bloomfield charges the captain was also negligent in deciding not to beach the Ronda. We find that beaching the Ronda would have consumed a great deal of time and would have blocked the channel,[61] and since the list and draft forward had stablized and only one hold was taking water,[62] the captain was justified in the circumstances in deciding not to beach her.

The Bloomfield urges that Captain Hansen's decision to moor the ship's port side against the pier was negligent because it wasted time and put additional pressure on the breach. We find, however, that the captain's decision was entirely reasonable. Placing the port side against the pier allowed access to the breached starboard side and made possible the use of mooring lines to support the vessel.[63] Moreover, if the listing starboard side had been placed against the pier, the pier would not have been able to support the ship and would have collapsed.[64] We conclude that Captain Hansen acted prudently in deciding to moor the Bloomfield's port side against the pier.

The Bloomfield further contends that the Ronda's captain acted unreasonably in not taking steps to salvage the vessel until water rushed into number one lower hold and, particularly, in not making use of the Abeille XII's salvage services until then.

We find that Captain Hansen, contrary to the contentions of the Bloomfield, did take steps to save the Ronda prior to the time when water rushed into number one hold. We find also that he proceeded at a slow speed in order to lessen the pressure on the breach [65] and that he utilized mooring lines to give his ship support.[66] We further find that the ship's list and draft forward had stabilized [67] and that the captain was justified in concluding, prior to the water rushing into the number one lower hold, that the ship was not in imminent danger of capsizing. We therefore conclude that the captain did not act unreasonably by waiting until water entered lower hold number one to call for the services of the Abeille XII.

The Bloomfield argues, finally, that the captain was negligent in not stationing a lookout to keep a watch on the bulkhead between holds one and two. We

---

56. Hansen 127.

57. Hansen 126–127.

58. Hansen 124, 127–128, 136.

59. Hansen 127, 133, 404.

60. Hansen 402–403.

61. Hansen 147.

62. Hansen 141–144, 409, 413–416.

63. Hansen 147–150.

64. Hansen 147, 150, 152.

65. Hansen 402–403.

66. Hansen 147, 152–153.

67. Hansen 409, 413–416.

find that the captain, knowing that there was great pressure on the bulkhead between lower holds one and two and also knowing that if the bulkhead cracked number one lower hold would be flooded,[68] acted unreasonably in not stationing a man to keep a watch on the bulkhead or the opening to the number one hold.

■ We conclude, however, that the negligence on the part of the Ronda was not "so extravagant and unusual" as to cut off the liability of the Bloomfield for negligence.[69] We further conclude that the seaworthy or unseaworthy condition of the Ronda was not a cause of the loss of cargo and thus cannot operate to relieve the Bloomfield of liability.[70]

■ We, therefore, conclude that the Bloomfield is jointly and severally liable with the Ronda for the collision and consequent loss of the Ronda's cargo. We now turn to the question of limitation of liability.

### LIMITATION OF LIABILITY

■ There being no evidence to the contrary, we find that the Bloomfield was a seaworthy vessel with a fully qualified captain and crew. The Bloomfield's liability for the collision and loss of cargo rests upon navigational and operational errors. We, therefore, conclude that the Bloomfield Steamship Company, as owner of the Bloomfield, is entitled to limit its liability to cargo claimants.[71]

■ A limitation fund consists of the owner's interest in the vessel plus the pending freight.[72] The value of the vessel is fixed as of the time the ship docks at the first port after the collision.

■ The parties stipulated, and we find, that the value of the Bloomfield

immediately prior to the collision was $540,000.00. Determination of the value of the Bloomfield immediately after the collision requires ascertainment of the loss in pre-collision value caused by the accident. The best measure of such loss is the amount of the expenditures for repairs and other costs incurred in attempting to put the ship in pre-collision condition. The costs of such repairs, if not excessive, are then deducted from the pre-collision value of the vessel.[73]

We find that the expenditures for repairs amounted to $5,984.76, as stipulated, and that the other costs for crew's wages, fuel and steward department's stores amounted to $1,994.44, as stipulated. We find that these expenditures were directly caused by the collision and were not excessive. They are, therefore, properly deducted from the value of the ship prior to collision to determine her value after the collision. Thus, we find that the owner's interest in the Bloomfield for the purposes of limitation amounted to $532,020.80.

■ The pending freight refers to all the freight for cargo on a particular voyage.[74] Once again, the parties have stipulated as to the dollar amounts, and we find that the total pending freight amounted to $148,796.24. We, therefore, conclude that the Bloomfield Steamship Company's limitation fund is $680,817.04.

### BLOOMFIELD'S CLAIMS AGAINST THE RONDA

Since the Ronda has settled with cargo interests, there remains for determination only the Bloomfield's claims against the Ronda for collision damages

68. Hansen 420–422.

69. The Algonquin, 70 F.2d 335, 336–337 (2d Cir. 1934).

70. Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46, 54 (5th Cir. 1967), cert. denied, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968).

71. 46 U.S.C. §§ 183 and 192.

72. Norwich Co. v. Wright, 80 U.S. (13 Wall.) 104, 20 L.Ed. 585 (1871); Gilmore & Black, Admiralty § 10–29 (1957).

73. Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890 (1925); 3 Benedict, Admiralty § 501 (6th ed. 1940).

74. Gilmore & Black, Admiralty § 10–29 (1957).

and indemnification for payments made to cargo.

 As to collision damages, the Bloomfield is entitled under the admiralty rule of divided damages [75] to recover from the Ronda one-half of the stipulated $7,979.20 the Bloomfield suffered in collision damages. Accordingly, we conclude that the Bloomfield is entitled to a judgment against the Ronda for $3,989.60.

As to the Bloomfield's indemnification claim against the Ronda for any payments the Bloomfield may have to make to cargo claimants, the Bloomfield, as a joint tort-feasor, can recover such payments only to the extent that they exceed one half cargo's total damage claim.[76] Since the Bloomfield's limitation fund, $680,817.04, is less than one-half cargo's total damage claim, $831,500.00, the Bloomfield will not be required to make payments in excess of one-half cargo's total damages and therefore is not entitled to indemnification. Even if a pending motion to withdraw certain cargo claims is granted, the Bloomfield will not be required to pay more than one-half cargo's total damages because she would be entitled to a reduction in her limitation fund equal to a pro rata share of the claims withdrawn. The Bloomfield's claim for indemnification is, therefore, denied.

Accordingly, the Bloomfield Steamship Company is entitled to an interlocutory decree limiting its liability to $680,817.04 and to a judgment against the Ronda for $3,989.60 for collision damages.

The foregoing constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

Settle a final decree on notice *within ten (10) days* in accordance with this opinion.

So ordered.

---

75. The Schooner Catharine v. Dickinson, 58 U.S. (17 How.) 170, 177–178, 15 L.Ed. 233 (1854); Gilmore & Black, Admiralty § 7-4 (1957).

76. Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 284–285, 72 S.Ct. 277, 96 L.Ed. 318 (1952); The "Juniata", 93 U.S. 337, 340, 23 L.Ed. 930 (1876).