Lester A. PLAISANCE

v.

UNITED STATES of America.

Civ. A. No. 76–2523.

United States District Court,
E. D. Louisiana.

June 6, 1977.

Mark S. Stein, New Orleans, La., for plaintiff.

Leonard Avery, New Orleans, La., and William Holmes, Dept. of Justice, Washington, D.C., for defendant.

ALVIN B. RUBIN, District Judge:

■ This tax refund case raises the question: is an American citizen within a foreign country during the time when he is the captain of a tug boat navigating in waters off the coast of England, beyond the three mile limit? For reasons set forth below, he is not. Hence, his claim for a tax refund, based on 26 U.S.C. § 911(a)(2), is denied.

I.

The plaintiff, Lester A. Plaisance, is a United States citizen whose domicile is in Louisiana. During the years 1967 and 1968, he worked for Nolty Theriot, Inc. as a tug boat captain. His employer assigned him to work on tugs in the North Sea prior to July 1, 1967, and, thereafter, he worked either in the North Sea, or in England or another country contiguous to the North Sea, except for a brief trip to the United States. During at least 510 full days of a consecutive eighteen month period during 1967 and 1968, Mr. Plaisance was either on the tug in the North Sea or in a contiguous country.

In his income tax returns, Mr. Plaisance claimed the benefit of the exclusion provided for in Section 911(a)(2) [1] of the Internal

1. This section reads as follows:
(2) Presence in foreign country for 17 months.—In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period.

Revenue Code of 1954. He received deficiency notices for the years 1968 and 1969 and paid the alleged deficiencies in amounts of $5,584.89 for 1968 plus interest of $1,113.84, and $3,157.48 for 1969 plus interest of $527.21. He now seeks refund of the amounts paid in 1968.

Plaintiff contends that he was present in a foreign country within the meaning of U.S.C. § 911(a)(2) for 510 full days during an 18 month consecutive period in 1967 and 1968, by virtue of his presence in the North Sea or a contiguous country. Treasury Regulation § 1.911–2(f) states that the term foreign country, as used in the statute, means "territory under the sovereignty of a government other than that of the United States and includes the air space over such territory." The government takes the position that, during the time Mr. Plaisance was on a boat in the North Sea, he was not "within a foreign country" as that term is used in the statute and defined in the regulation.

## II.

At a meeting of the United Nations Conference of the Law of the Sea, in Geneva, in 1958, the Convention on the Continental Shelf was adopted. The United States ratified this convention on April 12, 1961. In 1964, the English Parliament adopted the Outer Continental Shelf Act of 1964, which vested in Her Majesty all rights exercisable by the United Kingdom outside its territorial waters with respect to the continental shelf.

Article 1 of the Convention defines the continental shelf as the sea bed and subsoil of the submarine area adjacent to the coast but outside the area of the territorial sea, to a depth of 200 meters or, beyond that limit, to where the depth of the superjacent waters admits of the exploitation of the natural resources of the area. Article 2 states, "The coastal State exercises over the continental shelf sovereign rights for the purpose of exploring it and exploiting its natural resources." The Convention does

not, therefore, recognize that the coastal State has full sovereignty over the continental shelf, but only that it has "sovereign rights" for the purpose of natural resource development.

What is implicit in the limited grant contained in Article 2 is made explicit by restrictions contained in Article 3 of the Convention, which states:

The rights of the coastal State over the continental shelf do not affect the legal status of the superjacent waters as high seas, or that of the airspace above those waters.

This makes it clear that the waters above the continental shelf and the airspace above those waters retain their prior legal status and are not under the dominion of the coastal states.

Article 5 of the Convention expresses other limitations on the powers of the coastal states, and clarifies the continued international status of the continental shelf waters:

The exploration of the continental shelf and the exploitation of its natural resources must not result in any unjustifiable interference with navigation, fishing or the conservation of the living resources of the sea, nor result in any interference with fundamental oceanographic or other scientific research carried out with the intention of open publication . . . .

Similarly, Restatement 2d, Foreign Relations Law § 23 (1965), recognizes sovereignty to "prescribe and to enforce rules of law concerning the exploration and exploitation of the continental shelf off its coast and beyond the outer limit of its territorial sea." But this rule "gives jurisdiction in the continental shelf . . . only for the purpose of exploring and exploiting its natural resources." *Id.*, Comment *a.*

Counsel for the taxpayer points to actions of Great Britain with respect to the continental shelf waters as amounting to the exercise of sovereignty in the area. Even if such acts could be shown, they would not

The amount excluded under this paragraph for any taxable year shall be computed by

applying the special rules contained in subsection (c).

938

necessarily make the waters a foreign country for purposes of a United States tax statute. But, in fact, the legislation of Great Britain has been limited, and that nation has not undertaken to exercise sovereign rights over the waters beyond its three mile limit.

Thus Great Britain has vested its government with the exclusive right to search for and develop petroleum resources by the Petroleum (Production) Act 1934, 24 & 25 Geo. 5, ch. 36. Great Britain's Continental Shelf Act 1964, ch. 29, (the "Shelf Act") vested in the government of Great Britain any rights exercisable by the United Kingdom with respect to the sea bed and subsoil and their natural resources. Section 1(3) of that Act makes sections 2, 3, and 6 of the Petroleum Act applicable with respect to the United Kingdom's Continental Shelf. By a combination of the two Acts, the United Kingdom grants licenses to those people who desire to explore and exploit the natural resources of the North Sea within the United Kingdom's continental shelf area. Only English residents hold such licenses, and only they are permitted to explore and exploit its continental shelf area. See Notes following Finance Act 1973, ch. 51, § 38. In addition, those license holders acquire ancillary rights in the North Sea in order to exercise their rights. Mines Act, ch. 4, § 2.

The Shelf Act goes beyond the Petroleum Act in its exercise of jurisdiction over the continental shelf and superjacent waters. The regulations which the Board of Trade is to promulgate pursuant to the Petroleum Act are broadened by Section 1(4) of the Shelf Act, which requires the inclusion of provisions for the safety, health and welfare of persons employed on operations undertaken under authority of any license granted pursuant to the Petroleum Act.

But these Acts extend British power only to natural resource development. Thus, the Minister of Power may prohibit ships from entering designated areas, but only in order to protect installations in those areas. Shelf Act, § 2(1). The Act extends the civil and criminal law of the United Kingdom only to zones around installations within designated areas, Id., § 3(1), not generally to the waters above the coastal zone. Similarly, when, in the Finance Act of 1973, the United Kingdom exercised its taxing power and taxed all the continental shelf, it did not tax all persons aboard vessels in the North Sea.

The sovereign rights exercisable by a coastal state with respect to its continental shelf area, and the rights asserted in particular by Great Britain, do not, as the plaintiff concedes, constitute total or absolute sovereignty, for the rights of coastal states are limited by the Convention to those necessary for natural resource development.

■ The United States alone can determine, for purposes of its tax laws, as applied to its own nationals, whether a territory shall be recognized as being under the sovereignty of a foreign state. This is a political decision made by the political branches of the government, that is, the legislative and executive, not by the judiciary. Thus, as stated by the Supreme Court in *Jones v. United States*, 1890, 137 U.S. 202, 212, 11 S.Ct. 80, 83, 34 L.Ed. 691, where American jurisdiction over the island of Navassa was in issue:

> Who is the sovereign, de jure or de facto, of a territory is not a judicial, but a political, question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government. This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances.

See also *United States v. California*, 1947, 332 U.S. 19, 33–34, 67 S.Ct. 1658, 1665–1666, 91 L.Ed. 1889; *Vermilya-Brown Co. v. Connell*, 1948, 335 U.S. 377, 380, 69 S.Ct. 140, 142, 93 L.Ed. 76.

■ All countries recognize that a coastal state possesses sovereignty or territorial jurisdiction within three miles of its coasts. The Digest of International Law, Vol. 4, which was prepared by Marjorie M. Whiteman, Assistant Legal Advisor, the Department of State. However, such sovereignty

does not extend past this three mile limit. *Id.* at pp. 1–195. RESTATEMENT 2d, *supra*, § 15(2), Reporters' Note 1.

In *United States v. Louisiana*, 1960, 363 U.S. 1, 34, 80 S.Ct. 961, 981, 4 L.Ed.2d 1025, the Supreme Court indicated that the State Department did not recognize national boundaries to extend in excess of three miles off shore. The high seas, as distinguished from inland waters, it said, are conceded by modern nations to be subject to the "exclusive sovereignty of no single nation. * * * The extent to which a nation can extend its power into the sea for any purpose is subject to the consent of other nations, and assertions of jurisdiction to different distances may be recognized for different purposes." [2]

The failure of the Department of State to recognize that a foreign country had jurisdiction over the territory in question in 1968 further supports the conclusion that the plaintiff was not in a foreign country, within the meaning of Treasury Regulation § 1.911–2(f), when he was on a tug boat in the North Sea. Of course, the United States may have a different understanding of a foreign nation's sovereign limits for tax purposes than for political purposes. But there is no support either in the record or in materials of which the court might take judicial notice that such a different understanding exists or was intended to exist. Accordingly, the taxpayer was not in a foreign country within the meaning of 26 U.S.C. § 911(a)(2), and his claim for a tax refund is DENIED.

---

**2.** 26 U.S.C. § 911(a)(2).

The Supreme Court did not rule on the question of whether a letter from the Secretary of State would be conclusive as to the existence of the three mile limit, but did acknowledge this was the position taken by the Department of State. While this case was decided in 1959, its language is equally applicable to the year 1968, which is in issue here.