**MISR INSURANCE COMPANY and the General Organization for Supply Goods, Plaintiffs,**

v.

**M/V HAR SINAI, her engines, boilers, tackle, etc., and El Yam Bulk Carriers (1967) Ltd., Defendants-Third Party Plaintiffs,**

v.

**M/V EVANTHIA K, her engines, boilers, tackle, etc., and Alexandra K Shipping Co., S.A., Third-Party Defendants.**

**No. 76 Civ. 2901 (RWS).**

United States District Court,
S. D. New York.

Sept. 11, 1979.

Waesche, Sheinbaum & O'Regan, New York City, for plaintiffs; Louis P. Sheinbaum, Francis M. O'Regan, New York City, of counsel.

Burke & Parsons, New York City, for defendants-third party plaintiffs; Max Taylor, New York City, of counsel.

Poles, Tublin, Patestides & Stratakis, New York City, for third-party defendants; Theodore P. Daly, John J. Devine, Jr., New York City, Edward M. Cuddy, III, of counsel.

## OPINION

SWEET, District Judge.

This action arose out of a series of events which took place off the coast of Crete in March of 1976, involving the Panamanian-flag motor vessel EVANTHIA K, and the Israeli-flag motor vessel M/V HAR SINAI. The two ships collided at 0812[1] on March 8, 1976, and on March 9, 1976 at 0945, the EVANTHIA K stranded, subsequently becoming a total loss. While there are some questions of law to be resolved, the principal, and intriguing, task to be performed is to determine what happened on a sunny, clear day on the Aegean Sea over three years ago and whether what happened was responsible for the loss of the EVANTHIA K and the damage to her cargo. The determination is based upon a review of depositions and numerous exhibits, and the testimony of experts. Highly competent counsel have piloted the court with great skill through this mass of depositions, exhibits, and expert testimony and have been of great assistance in providing the essential clues which have made it possible to resolve conflicting contentions.

Both vessels failed to comply with the International Rules of the Road, as set forth below, resulting in the collisions. Eight-five percent of the fault in connection with the collisions was that of the HAR SINAI; fifteen percent was attributable to the EVANTHIA K. The collision was the proximate cause of the stranding. The plaintiffs will recover their damage from HAR SINAI and EL YAM BULK CARRIERS (1967) LIMITED ("EL YAM"), which in turn will recover fifteen percent of that amount from the EVANTHIA K and Alexandra K Shipping Co., S.A. ("AKS").

The plaintiffs are MISR Insurance Company ("MISR"), the insurer of the cargo which was lost, and the General Organization for Supply Goods ("GOFSG"), the owner of the cargo. The defendants, HAR SINAI and its owner EL YAM filed a third party complaint impleading the EVANT-HIA K and its owner AKS. In a written opinion dated November 2, 1978, this court granted a motion by EL YAM to amend its *ad damnum* clause to include a claim that plaintiffs have judgment directly against the third party defendants. The effect of that amendment was to view the action as if plaintiffs had originally sued both defendants and third party defendants. Opinion of November 2, 1978, at 3–4. The Honorable Henry F. Werker, exercising jurisdiction over the dispute upon the consent of all parties, denied a motion of the EVANTHIA K to stay the claim brought by plaintiffs against AKS pending arbitration. *MISR Ins. Co. v. M/V Har Sinai*, 1978 A.M.C. 1223 (S.D.N.Y.1977) (not officially reported). Subsequently, three witnesses were heard at trial before this court, and numerous exhibits were admitted into evidence, including ten depositions.

### The Vessels

The EVANTHIA K was constructed in 1953. She was 229.44 feet in length, 35.44 feet in beam, and had a summer timber draft of 15 feet 3½ inches at a deadweight (or weight carrying) capacity of 1,586 long tons.

The HAR SINAI was a bulk carrier constructed in 1961. She was 676.21 feet in length, 74.18 feet in beam, and had a maximum draft of 35.62 feet at a deadweight capacity of 28,754 long tons. Her gross tonnage was 19,030 long tons. Thus, the loaded HAR SINAI was approximately 15 to 20 times the weight of the loaded EVANTHIA K and three times its length.

### The Undisputed Facts

The EVANTHIA K was loaded at Sibenik, Yugoslavia, with a cargo of 1,615.761 cubic meters (1,272 long tons) of beechwood which was not bound into bundles. A bill of lading was issued by the master of the EVANTHIA K, GOFSG was the consignee, and Alexandria, Egypt, the port of dis-

---

1. The times set forth in this opinion are based on bridge time on the HAR SINAI, for reasons subsequently to be set forth. Bridge time on the EVANTHIA K was 8 minutes later. Thus the collision took place at 0812 on the HAR SINAI and at 0820 on the EVANTHIA K.

charge. The seller of the beechwood was SIPAD, which had entered into a charter party with Agoudimos (Flandermar), which in turn had chartered the EVANTHIA K from its owners, AKS. There is no evidence that GOFSG was aware of this charter or that it assumed responsibility for the loading or, indeed, even for the cost of loading.

The EVANTHIA K departed from Sibenik on March 3 and encountered heavy weather, which increased to gale force by March 7. The ship developed a seven degree port list and took refuge in the Bay of Messara. The next morning, March 8, the weather having improved, the EVANTHIA K departed, steadying on the Cape Litmos Lighthouse on the southern coast of Crete, and set a course of 131 degrees for Alexandria at a speed of 9–10 knots. Visibility was good.

At the same time the HAR SINAI was proceeding from New Orleans off the same coast, on a course of 103 degrees, for Haifa at a speed of 13.5 knots. At 0710 the Chief Mate of the HAR SINAI observed the EVANTHIA K at a relative bearing of 30–35 degrees off the port bow of the HAR SINAI at a range of six miles. At 0750 the Chief Mate observed the relative bearing of the EVANTHIA K to be constant, and the range to be about three miles. During this time the HAR SINAI was operating on its automatic pilot.

At 0752 the Master of the EVANTHIA K, Voliotis, observed the HAR SINAI off his starboard quarter, and between 0752 and 0757 the EVANTHIA K came left to a course of 120 degrees. After remaining on this course for a minute or so, Voliotis came right to his original course of 131 degrees and sought to signal this course change, only to have the cord to the whistle part, thus precluding his signaling the change.

Meanwhile, the Chief Mate of the HAR SINAI was being relieved by the Acting Third Mate, Marmour, who was advised by the Chief Mate that the EVANTHIA K was on a parallel course and that the relative bearing was opening to port. No radar ranges or bearings were taken, no plot was maintained on the HAR SINAI, and no lookouts other than the deck officer were posted.

Certain of the events aboard the HAR SINAI after Marmour relieved the Chief Mate are disputed and will be discussed below. At 0810 the Captain of the HAR SINAI, while in his cabin, saw the EVANTHIA K through a porthole, rushed to the bridge, stopped the engines, and sounded one whistle blast. At 0812 the ships collided, with the port bow of the HAR SINAI striking the starboard side of the EVANTHIA K with force perceptible on the HAR SINAI. The starboard bulwarks and plates of the EVANTHIA K were buckled by the collision. A second contact was made a few moments later, the location of which is relevant and in dispute.

Voliotis informed Captain Shen, the Master of the HAR SINAI, that the EVANTHIA K was taking on water, and requested him to stand by. Captain Shen, after contacting the owners of the HAR SINAI, requested payment for accompanying the EVANTHIA K, and Voliotis, unable to reach his owners, was unable to give a satisfactory reply. The HAR SINAI, at 0830, resumed a course of 103 degrees and her former speed, and departed for Haifa.

Voliotis set course for San Nikolo, which was 125 miles distant. At about 1352 the EVANTHIA K anchored off Ierapetra Bay with a slight port list and Voliotis sought unsuccessfully to contact his owners. The EVANTHIA K was not protected from the wind and sea from the southeast. The local maritime authorities were unwilling to have the ship remain in Ierapetra Bay. The holds were pumped during the night, but could not be sounded. Voliotis testified by deposition that after midnight a slight list to starboard developed.

At approximately 0430 on March 9 the EVANTHIA K departed Ierapetra Bay for the more sheltered harbor of Sitia on the northern shore of Crete. Despite pumping, more water entered the EVANTHIA K and a substantial starboard list of about 20 degrees developed. Steering control was lost because of auxiliary and main engine mal-

functions which occurred as a result of the list, and the ship grounded on a rocky area off the eastern shore of Crete.

With the exception of the Master, Chief Officer, and Chief Engineer, the crew got ashore. The next day, salvage was attempted but was unsuccessful as a consequence of heavy weather. Some cargo was subsequently removed, but after three days of heavy weather the EVANTHIA K was determined to be a constructive total loss.

### Findings of Disputed Facts

There is no substantial dispute as to the facts thus far set forth. However, the parties are sharply at issue as to the events just before and after the collision, and as to the cause of the stranding of the EVANTHIA K on March 9.

Whether the Chief Mate of the HAR SINAI, by the time he was relieved by Marmour, had observed the course change of the EVANTHIA K, or whether Marmour was on deck at that time, either officer viewing the EVANTHIA K while it was on a course of 120 degrees might have concluded that no collision would occur. However, upon the resumption of the 131 degree course by the EVANTHIA K, the closing courses of the two ships were resumed.

For some time prior to the morning of March 8 the automatic course recorder of the HAR SINAI had been inoperative. This device consisted of a stylus coordinated with the ship's course, which left a tracing on a paper moving at a constant speed. When operative, the stylus moved with a change in course, the movement being measurable both in time and degrees. The stylus had been stuck until dislodged, at which time recording was resumed. An employee of EL YAM testified that the recorder functioned properly after operation was resumed and that its operation could be verified from 0830, the time when the HAR SINAI resumed its course of 103 degrees and its speed of 13.5 knots.[2] Using that moment as a fixed point in the recording process, the calculation was then made that the recorder commenced operation at 0805.

Although Marmour denied taking any action upon assuming his deck responsibilities, the recorder indicates a 50 degree course change to the left at 0805, and the testimony concerning the course recorder establishes that it was that sharp turn which reactivated the stylus. The HAR SINAI from 0805 to 0810 was swinging left to 040 degrees in an attempt to turn under the stern of the EVANTHIA K. When Captain Shen reached the bridge, he ordered a hard right. The recorder indicates that the course change to starboard commenced at 0812.4, resulting in a course of 205.2 degrees, which was then changed to the left to return at 0830 to the base course of 103 degrees.

The recorder thus confirms all but Marmour's testimony, which does concede a hard left turn, but only after the collision. The course recorder is also confirmed by the second contact between the two ships, which occurred between the port quarter of the HAR SINAI and the starboard quarter of the EVANTHIA K. There being no evidence that the EVANTHIA K altered course to the left shortly before or after the collision, this second contact confirms that the HAR SINAI was swinging right in response to Captain Shen's course change.

Therefore, the HAR SINAI, which was the overtaking vessel, observed the constant bearing of the EVANTHIA K indicating a collision course, failed to take any ranges or bearings by radar or to maintain a plot, altered course sharply to port without signal in an obviously unsuccessful effort by Marmour to pass under the EVANTHIA K's stern, and finally came right and stopped her engines too late to avoid the collision. The EVANTHIA K, shortly after becoming aware that the HAR SINAI was bearing down upon her, came left to avoid the HAR SINAI, then resumed her initial course without signal, thereby contributing to the misjudgment of those on the bridge of the HAR SINAI.

No direct evidence was presented to establish that the proximate cause of the

---

2. This moment in time is also fixed by Captain Shen, who testified that he checked the time when the 103 degree course was resumed and when the log entry of 0830 was made.

stranding of the EVANTHIA K was the collision as found to have occurred as stated above. No testimony of the inspecting diver was presented, and there is no direct evidence of an observable crack or opening in the hull of the EVANTHIA K which may have resulted at the time of the collision. There is, as is only to be expected, a conflict among the possible inferences to be drawn from the evidence with respect to the ultimate factual question of the cause of stranding. There is, however, little conflict as to the facts themselves.

The plates on the EVANTHIA K were wasted and buckled in a number of sections, both topside and hull, which sections were subjected to stress as a consequence of the collisions and the previously encountered heavy weather. The holds were no longer separated by a watertight bulkhead. The maintenance of the EVANTHIA K had not been meticulous, as is established by the parting of the whistle cord and the relatively recent engine-room repairs. However, the ship had been maintained in class by Lloyds' Register of Shipping.

The EVANTHIA K developed a port list during the heavy weather. That list caused the EVANTHIA K to put into the Bay of Messara, and it resulted from a shifting of cargo and a sail effect during the storm. Upon the EVANTHIA K's departure from the Bay of Messara, the list was down to two degrees which was maintained until and after the collision. That afternoon, off Ierapetra, the port list increased as a consequence of the slight shift in cargo and the water being taken on. That evening, the EVANTHIA K was pumped dry and when the voyage was resumed on March 8 there was a slight starboard list which increased over time to become the fatal list which resulted in the engine failure and the stranding.

Heavy weather, breaking seas, and heavy rain were encountered by the EVANTHIA K prior to the morning of March 8, but there was no indication or record of any need to pump the holds. The record indicates that this pumping began after the collision, and continued on a relatively con-stant basis until just before the stranding. There was evidence that whatever her other faults may have been, the EVANTHIA K had no prior record of leaks in her holds.

The expert testimony at trial conflicted: the HAR SINAI experts maintained that the water in the hold must have resulted from the condition of the ship; the EVANTHIA K experts maintained that the ship had been properly maintained, and that the increased flow of water resulted from a fissure which increased over time as the ship worked its way up the coast. Given the history of the vessel in this regard, the observable damage, the force of the collisions, the assertion that water was being taken on immediately after the collision, the shift in the list, the sequence of the pumping, the normal working of the ship on March 8 in a moderate sea, and the absence of any other apparent contributing factor for the flooding on the morning of March 8, the court finds that these factors, taken together, establish by a preponderance of the evidence that the collision was the proximate cause of the stranding of the EVANTHIA K. This finding is not disturbed by the assertion that unadduced evidence might have established otherwise.

Also at issue is the place of the collision. At the time, both ships located the collision as being more than five miles off the coast of Crete, within the six mile limit for territorial waters claimed by Greece.

Captain Patterson, the MISR expert plotted the courses and speeds of both vessels from points established before the collision, and concluded that the collision took place outside the six mile limit, but conceded that the best fix was the mean position between the positions of the two ships as reported at the time. Based upon this evidence, the court finds that the collision took place more than five miles off the coast of Crete.

The facts concerning the loading of the EVANTHIA K at Sibenik have been placed in issue by the HAR SINAI to establish: (1) that the loading was improper and excessive and the cause of the stranding; and (2) that this bars any recovery by MISR and GOFSG because it was conducted on their

behalf. The latter contention is devoid of actual conflict and is dealt with below as a conclusion of law. If the forepeak was full at the time of departure, there is evidence by way of mathematical calculation that the EVANTHIA K would have been over her summer marks. Captain Voliotis testified that the EVANTHIA K was not over her marks and that she was inspected by the Harbor Master, who would not have permitted her departure if she had been over her marks. Be that as it may, even if it is assumed that the EVANTHIA K was over her marks by an inch, the consumption of fuel and stores from the time of departure until the morning of March 8 was in excess of 15 tons and thereby raised the loadline by an inch. Finally, no evidence was presented to establish that overloading of the character alleged by the HAR SINAI reduced the EVANTHIA K's metacentric height in such a manner as to result in her listing and consequent stranding.

HAR SINAI has noted the presumption set forth in *The Pennslyvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873), that:

. . . [W]hen . . . a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collision, it is no more than a reasonable presumption that the fault . . . was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

The HAR SINAI has urged first that its proof demonstrates that the EVANTHIA K was overloaded, in violation of the International Load Line Convention, and second, that the rebuttable presumption set forth in *The Pennslyvania* applies not only to collision cases, but to cases in which the loss allegedly caused by overloading results from other types of accidents. *See, e. g., Petition of Long*, 439 F.2d 109 (2d Cir. 1971) (presumption applied in case where overloaded ship foundered).

However, as stated above, the EVANTHIA K was not overloaded on March 8 and for that reason the presumption discussed in *The Pennslyvania, supra,* does not apply to the facts of this case.

■ Even if the EVANTHIA K had been unseaworthy at the time of the collision, this "drastic and unusual presumption," G. Gilmore & C. Black, The Law of Admiralty at 404 (1957), may well not be applied to a loss of cargo occasioned by stranding without a relationship being established between the unseaworthy condition and the stranding. Indeed, two recent decisions of the Court of Appeals for the Second Circuit have refused to accept the presumption in cases involving strandings. *See Director General of India Supply Mission v. S. S. Maru*, 459 F.2d 1370, 1374–76 (2d Cir. 1972) *cert. denied*, 409 U.S. 1115, 93 S.Ct. 898, 34 L.Ed.2d 699 (1973); *Wilkins v. American Export Isbrandtsen Lines, Inc.*, 446 F.2d 480, 483–86 (2d Cir. 1971) *cert. denied*, 404 U.S. 1018, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972).

Finally, even if the HAR SINAI was entitled to the presumption, it has been rebutted by evidence concerning the March 8 collision.

### Conclusions of Law

The agreement between the seller SIPAD and GOFSG stated that it was the latter's obligation to conclude a contract of transport and to advise the sellers, indicating at the same time the name of the vessel. It is urged that the vessel was negligently loaded, that this loading was the proximate cause of the loss, and that GOFSG's negligence in this regard bars its and MISR's recovery. The facts to the contrary have been found above. Moreover, the law of the case has been stated by Judge Werker:

For the reasons stated below I find that the bill of lading did not incorporate the terms of any charter party . . . In light of the fact that there are two. "Gencon" charters in question, I hold that the reference to the "Gencon" charter party within the bill of lading was ambiguous and therefore failed to effectively incorporate the terms of any charter party within the bill of lading. Accordingly,

the motion for a stay pending arbitration is denied.

*MISR Insurance Co. v. M/V Har Sinai,* 1978 A.M.C. 1223, 1224 and 1227 (S.D.N.Y.1977) (Not officially reported).

 Furthermore, even if Judge Werker's ruling were to be ignored, which it is not, the above-referred-to contractual provision does no more than allocate the responsibility for obtaining the contract and does not alter the responsibility for loading which was placed on the EVANTHIA K by the charter between SIPAD and Flandermar, as well as by logic and the authorities. *See In the Matter of the Arbitration re: the S. S. Kimon* at p. 6 (unreported arbitration award No. 225, dated December 14, 1967); *In the Matter of the Arbitration re: M/V St. Fotini,* at p. 2 (unreported arbitration award No. 1181, dated December 23, 1977). *See generally Olsen v. United States Shipping Co.,* 213 F. 18, 21 (2d Cir. 1914). As a matter of law, under the bill of lading and the two charters at issue here, MISR and COFSG did not assume responsibility for loading, even if it were concluded, which it is not, that responsibility for arranging for the transport was theirs and that the cost of loading was to be borne by the plaintiffs.

As to application of law, at this time, the parties having chosen this court to be their forum, United States law will apply, which law presently recognizes only a three mile territorial limit as to the high seas off Greece. *See The Belgenland,* 114 U.S. 355, 369, 5 S.Ct. 860, 29 L.Ed. 152 (1885); *United States v. California,* 332 U.S. 19, 34–35, 67 S.Ct. 1658, 91 L.Ed. 1889 (1946); *Esso Transport Co., Inc. v. Terminales Maracaibo, C. A.,* 356 F.Supp. 1367, 1369 (S.D.N.Y. 1973); *Plaisance v. U. S.,* 433 F.Supp. 936, 938–39 (E.D.La.1977); Restatement of Law 3d, Foreign Relations Law of the U. S. § 15, and Comments and Reporters' Notes thereto.

The HAR SINAI, on the facts set forth above, was the overtaking vessel, which was obligated to stand clear, and MISR and GOFSG are entitled to recover their loss which resulted from HAR SI-

NAI's negligence, including its selection of course and speed, and its failure to post appropriate lookouts, to employ its radar to take ranges and bearings, and to maintain an appropriate plot. *See, e. g.,* International Rules of the Road, Rule 24(a) (33 U.S.C. § 1086); Rule 22 (33 U.S.C. § 1084); Rule 29 (33 U.S.C. § 1091) (these rules have been renumbered subsequent to the date of the collision); *Petition of Bloomfield Steamship Co.,* 298 F.Supp. 1239, 1244 (S.D.N.Y., 1969), *aff'd* 422 F.2d 728 (2d Cir. 1970); *The Ariadne,* 80 U.S. (13 Wall.) 475, 478, 20 L.Ed. 542 (1871).

The EVANTHIA K, on the facts set forth above, failed to comply with the International Rules of the Road by changing course and by failing to signal this course change, and was 15 per cent negligent. HAR SINAI and EL YAM are entitled to recover from the EVANTHIA K and AKS for those amounts paid to the plaintiffs pursuant to this opinion, up to and including 15 percent of such total amount of damages paid.

Plaintiffs shall, within ten days hereof, submit to the clerk of this court, on notice, a judgment consistent with this opinion.

IT IS SO ORDERED.